Doctor Angel Acevedo **MONTALVO** and
Julia de Jesus Ortiz, Plaintiffs,

v.

Hon. **Rafael Hernandez COLON**, Governor of the Commonwealth of Puerto
Rico, et al., Defendants.

Civ. No. 1113–73.

United States District Court,
D. Puerto Rico.

June 18, 1974.

Santos P. Amadeo, Rio Piedras, P. R.,
for plaintiffs.

Dept. of Justice, Commonwealth of Puerto Rico, through Jaime Rodriguez Lecoeur, Old San Juan, P. R., for defendants.

Before COFFIN, Circuit Judge, and TOLEDO and PESQUERA, District Judges.

## OPINION

PER CURIAM.

Plaintiff Julia de Jesus Ortiz,[1] a citizen of the Commonwealth of Puerto Rico, is a forty year old woman who has borne eleven children, of whom nine are alive. At the commencement of this suit she was approximately one month pregnant. Plaintiff Dr. Angel Acevedo Montalvo is Mrs. Julia de Jesus Ortiz' personal physician. Respondents are the Governor, the Secretary of Justice, and the Police Superintendent of the Commonwealth of Puerto Rico. Plaintiffs seek declaratory and injunctive relief pursuant to 42 U.S.C. § 1983, claiming that certain provisions of the criminal laws of Puerto Rico which deal with abortions are in violation of the Constitution of the United States in light of the recent Supreme Court decisions in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) and Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed. 2d 201 (1973).

The complaint alleges that plaintiff Mrs. de Jesus Ortiz wishes to have an abortion and that Dr. Acevedo is willing to perform such an abortion upon her but that they fear criminal prosecution if they proceed. The criminal statutes in question are 33 L.P.R.A. §§ 1051–1054, which provide:

"It is hereby prohibited, except in the case of therapeutic prescription by a physician duly authorized to practice medicine in Puerto Rico, for the purpose of preserving health or life, to prescribe, advise, or induce abortion, or to practice abortion on a pregnant woman. (33 L.P.R.A. § 1051)

"Every person who, in violation of the provisions of section 1051 of this title, may furnish, prescribe, or administer to a pregnant woman, by oral, rectal, or vaginal injections, any drug, substance or medicinal, therapeutics, or opotherectic agent, or who uses any surgical instrument, or mechanical agent with the intention or purpose of causing abortion, or practicing an abortion, shall be guilty of a felony, and, upon conviction shall be punished by imprisonment . . . . (33 L.P.R.A. § 1052)

"Every person who provides, supplies, or administers to any woman, or forces any such woman to take any medicine, drug or substance, or uses or employs any instrument or other means whatever with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, and every person who helps to commit any such act shall be punishable by imprisonment in the penitentiary for from two to five years. (33 L.P.R.A. § 1053)

"Every woman who solicits of any person any medicine, drug or substance whatever, and takes the same, or who submits to any operation, or to any other surgical intervention, or any other means, with the intent thereby to procure a miscarriage, unless the same is necessary to preserve her life, is punishable by imprisonment in the penitentiary for from two to five years." (33 L.P.R.A. § 1054)

The complaint further alleges that the abortion is not required because of any known medical risk associated with the pregnancy, but because Mrs. de Jesus Ortiz "does not want to have any more children". In an amendment to the original complaint it is asserted that subsequent to the filing of this action, Dr. Acevedo has been approached by other women who desire to have an

---

1. This name is a pseudonym. *See* Roe v. Wade, 410 U.S. 113, 124, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), Doe v. Bolton, 410 U.S. 179, 187, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973).

abortion under circumstances similar to those of Mrs. de Jesus Ortiz.

## I. Justiciability

After this action had been instituted plaintiffs were advised by counsel for defendants that no criminal prosecutions would result from performance of an abortion upon Mrs. de Jesus Ortiz. Defendants accordingly argue that this case is not justiciable, for lack of a live case or controversy.

■ It is clear that as of the commencement of this suit plaintiffs possessed the requisite standing to challenge the Commonwealth's abortion statutes. *See* Roe v. Wade, *supra,* Doe v. Bolton, *supra.* Indeed, we do not understand defendants to seriously contest this point. But it is the contention of defendants that once plaintiffs had received formal assurance that they would be subject to no criminal liability they thereupon lost their standing, or the case was rendered moot.

The reason given by the defendants for their assurance to the plaintiffs is that an abortion performed upon Mrs. de Jesus Ortiz would be "therapeutic" and thus exempt from liability under the provisions of 33 L.P.R.A. § 1051. To the extent that this point coincides with the merits of this controversy we will postpone its consideration to our discussion of the merits. At this juncture our concern is only with the question of whether, despite defendants' assurance, plaintiffs have "established that 'personal stake in the outcome of the controversy', Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), that insures that 'the dispute sought to be adjudicated will be presented in an adversary context and in a form historically viewed as capable of judicial resolution', Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), and Sierra Club v. Morton, 405 U.S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)

. . . ." Roe v. Wade, *supra,* at 123, 93 S.Ct. at 712.

The assurance of no prosecution given in this case was an individualized ad hoc decision, perhaps easily arrived at in light of Mrs. de Jesus Ortiz' age and number of children. We are referred to no written statement of policy, criteria, or long standing custom, with which the assurance given here is consistent. Nor could it be argued that prior to the issuance of the promise not to prosecute, plaintiffs' fears of possible criminal penalties were fanciful. To accept without question the proposition that by virtue of a prosecutorial decision not to prosecute, made after a civil rights action of this type has been initiated, a federal court can always be deprived of jurisdiction, does not appeal to us. And, as the Chief Justice has said, referring to the statute at issue in Roe v. Wade, "no one in these circumstances should be placed in a posture of dependence on a prosecutorial policy or prosecutorial discretion." [2]

■ We need not decide this issue. Whatever the effect of defendants' assurance upon Mrs. de Jesus Ortiz, Dr. Acevedo retains his standing, and confers upon this suit a continuing adversary nature. As the Supreme Court said in Doe v. Bolton:

"We conclude, however, that the physician-appellants, who are Georgia-licensed doctors consulted by pregnant women, also present a justiciable controversy and do have standing despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes. The physician is the one against whom these criminal statutes operate in the event he procures an abortion that does not meet the statutory exceptions and conditions. The physician-appellants, therefore, assert a sufficiently direct threat of personal detriment. They

2. Doe v. Bolton, *supra,* at 208, 93 S.Ct. 705, 755 (Burger, C. J., concurring in Roe v. Wade and Doe v. Bolton).

should not be required to await and undergo a criminal prosecution as the sole means of seeking relief." 410 U. S. at 188, 93 S.Ct. at 745.

It is alleged in the amended complaint that Dr. Acevedo has been in professional contact with other women who desire abortions but are deterred by the abortion statutes. Furthermore, this kind of recurring situation can be anticipated in a physician's practice of his profession. The impact of the abortion statutes upon a physician like Dr. Acevedo is thus a continuing one, and is not obviated by an isolated ad hoc promise of immunity. We therefore find this case justiciable.

## II. Abstention

██ Defendants also suggest that this court abstain and wait until the Supreme Court of the Commonwealth has had an opportunity to construe the Puerto Rican abortion statutes in the light of Roe v. Wade and Doe v. Bolton. While we find this question to be one not free from all doubt, we conclude that abstention would be unwarranted. We are fully cognizant of the admonishment of Fornaris v. Ridge Tool Co., 400 U.S. 41, 91 S.Ct. 156, 27 L.Ed.2d 174 (1970), that federal courts not intervene needlessly in matters which could be resolved by adjudication in the courts of the Commonwealth. But we also recognize that this case deals with extremely important rights whose exercise is unusually dependent upon temporal considera-

tions. The right to privacy which is associated with the decision to terminate a pregnancy is a right which is effectively lost through even minor delay. As in cases involving freedom of speech, abstention in this kind of case may involve "high costs", cf. Druker v. Sullivan, 458 F.2d 1272, 1274 (1st Cir. 1972). "Because of the delay caused by the abstention doctrine, it is particularly disfavored in First Amendment or civil rights cases . . . .", Marin v. University of Puerto Rico, 346 F.Supp. 470, 478 (D.P.R.1972), see also Mayor of the City of Philadelphia v. Educational Equality League, 415 U.S. 605, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974), Wisconsin v. Constantineau, 400 U.S. 433, 437–439, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971), Boggett v. Bullitt, 377 U.S. 360, 379, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964), McNeese v. Bd. of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), Tomas Torres Cintron v. State Bd. of Education, (No. 764–72, D.P.R.1974). We therefore think it incumbent upon us, under all of the circumstances, to deal with this important and sensitive issue at this time, and to resolve some of the doubt which now surrounds this question.[3] Cf. Hathaway v. Worcester City Hospital, 475 F.2d 701 (1st Cir. 1973).[4]

## III. Applicability of Roe v. Wade and Doe v. Bolton to Puerto Rico

It is tempting to assume the applicability of Roe v. Wade and Doe v. Bolton to this Puerto Rican litigation. Indeed

---

3. Plaintiffs assert also, with justification, that there has been injected into the controversy over abortion the issue whether the recent Supreme Court decisions apply to Puerto Rico, and that their rights are in a crepuscular limbo until clarified. This situation is similar to the one in Doe v. Woodahl, 360 F.Supp. 20 (D.Mont.1973), in which the court declined to abstain in an abortion case in part because the official position of the state that Roe v. Wade was inapplicable "shadows the constitutional rights of women as delineated in Roe v. Wade, supra, and confuses the members of the medical profession who may be called upon to perform abortions." 360 F.Supp. at 22.

4. Exhaustion of state remedies is not required in a case of this type. See Steffel v. Thompson, 415 U.S. 452, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), Carter v. Stanton, 405 U.S. 669, 92 S.Ct. 1232, 31 L.Ed.2d 569 (1971), Wilwording v. Swenson, 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971), Houghton v. Shafer, 392 U.S. 639, 88 S.Ct. 2119, 20 L.Ed.2d 1319 (1968), Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967) McNeese v. Bd. of Education, 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963), Raper v. Lucey, 488 F.2d 748 (1st Cir. 1973), at 751 n. 3.

the issue was not strongly argued within the briefs or courthouse. But litigants have been concerned over jurisprudential matters of lesser import, such as the applicability of certain federal statutes to Puerto Rico. Caribtow Corp. v. Occupational Safety and Health Review Commission, 493 F.2d 1064 (1974), N. L. R. B. v. Security National Life Insurance Co., 494 F.2d 336 (1974). This reflects the fact that the legal implications and possibilities of Puerto Rico's status are a continuing concern of major interest. In this case, the conflict between the right of privacy underlying abortion and the right to life as theologically or philosophically viewed is so deep that citizens, *see* n. 3, understandably question the applicability of fundamental rulings which are deemed alien to beliefs deeply held. Both because we have an inherent responsibility to be sure that law applies before we apply it and because it is important that not only lawyers but people generally know why a court decides as it does, we address to the best of our ability the question of the applicability of the Supreme Court's decisions to Puerto Rico.

Our discussion begins with the case of Downes v. Bidwell, 182 U.S. 244, 21 S. Ct. 770, 45 L.Ed. 1088 (1901), one of the so-called Insular Cases. This was the birthplace of the doctrine of "unincorporated territories" and the theory that as to such territories the Constitution is not fully applicable. Basically, the territories of the United States were divided into two classes: incorporated territories, those clearly destined for statehood, in which the Constitution applied in full;[5] and unincorporated territories, Puerto Rico and the Philippines, not clearly destined for statehood at the time of acquisition, in which the Constitution applied to some lesser degree. The attention of the Court in *Downes* was focused on the question of tariffs, and the holding was that the provision of the Constitution which requires that "all Duties, Imposts and Excises shall be uniform throughout the United States"[6] did not apply to Puerto Rico. But in developing its theoretical basis for this holding the Court dealt briefly with the question of personal liberties. In the opinion of Mr. Justice Brown:[7]

"We suggest, without intending to decide, that there may be a distinction between certain natural rights enforced in the Constitution by prohibitions against interference with them, and what may be termed artificial or remedial rights which are peculiar to our own system of jurisprudence. Of the former class are the rights to one's own religious opinion and to a public expression of them, or, as sometimes said, to worship God according to the dictates of one's own conscience; the right to personal liberty and individual property; to freedom

---

5. *See* Rasmussen v. United States, 197 U.S. 516, 25 S.Ct. 514, 49 L.Ed. 862 (1905), in which the Sixth Amendment right to jury trial was applied to Alaska.

6. United States Constitution, Art. I, § 8, *see also* Art. I, § 9.

7. There was no majority position of the Court. Separate concurring opinions were written by Mr. Justice Gray and Mr. Justice White, whose opinion was joined by Justices Shiras and McKenna. There were four dissenting votes. However, the position taken in the quoted passage received wide support, the opinion of Mr. Justice White agreeing that, while not all constitutional protections apply in unincorporated territories, "there may nevertheless be restrictions of so fundamental a nature that they cannot be trans-

gressed." 182 U.S. at 291, 21 S.Ct. at 788. Mr. Justice White later declared that, "[t]here is in reason, then, no room in this case to contend that Congress can destroy the liberties of the people of Porto Rico by exercising in their regard powers against freedom and justice which the Constitution has absolutely denied." 182 U.S. at 298, 21 S.Ct. at 791. The four dissenting Justices noted with approval that "[t]he concurring opinion [of Mr. Justice White] recognizes the fact that Congress, in dealing with the people of new territories or possessions, is bound to respect the fundamental guarantees of life, liberty, and property . . . ." 182 U.S. at 373, 21 S.Ct. at 820. *See also* 182 U.S. at 364, 21 S.Ct. 770. (Fuller, C. J., Harlan, Brewer and Peckham, JJ. dissenting).

of speech and of the press; to free access to courts of justice, to due process of law, and to an equal protection of the laws; to immunities from unreasonable searches and seizures, as well as cruel and unusual punishment; and to such other immunities as are indispensable to a free government. Of the latter class are the rights to citizenship, to suffrage . . . and to the particular methods of procedure pointed out in the Constitution, which are peculiar to Anglo-Saxon jurisprudence, and some of which have already been held by the states to be unnecessary to the proper protection of individuals.

"Whatever may be finally decided by the American people as to the *status* of these islands and their inhabitants,—whether they shall be introduced into the sisterhood of states or be permitted to form independent governments,—it does not follow that in the meantime, awaiting that decision, the people are in the matter of personal rights unprotected by the provisions of our Constitution and subject to the merely arbitrary control of Congress. Even if regarded as aliens, they are entitled under the principles of the Constitution to be protected in life, liberty, and property." 182 U.S. at 282–283, 21 S.Ct. at 785.

Subsequently, in Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L. Ed. 128 (1904), a case arising in the Philippines, the unincorporated territory theory of the *Downes* case was confirmed,[8] and the Court held that the right to trial by jury in criminal cases did not extend to such territories, finding the right to a jury trial not a "fundamental" one, 195 U.S. at 146–148, *see also* Hawaii v. Mankichi, 190 U.S. 197,

23 S.Ct. 787, 47 L.Ed. 1016 (1903). The next, and last, extensive treatment by the United States Supreme Court of the question of the application of the United States Constitution to Puerto Rico is Balzac v. Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922). *Balzac* involved a prosecution for libel and the key issue raised was whether the passage of the Jones Act of 1917 as the Organic Act for Puerto Rico, and the granting of United States citizenship to citizens of Puerto Rico, had so undermined the basis for applying the rationale of *Dorr* as to make the denial of jury trial constitutionally defective. The Court found that, "[t]he guaranties of certain fundamental personal rights declared in the Constitution, as for instance that no person could be deprived of life, liberty or property without due process of law, had from the beginning full application in the Philippines and Porto Rico . . . ." 258 U.S. at 312–313, 42 S.Ct. at 348.[9] The Court also found that by acquiring United States citizenship Puerto Ricans had gained the privileges of travelling in foreign lands under the protection of that citizenship, and of being able to freely move to the continental United States and become a citizen of a state without the requirement of naturalization. But the Court held that the right to trial by jury continued to be inapplicable in Puerto Rico, relying upon *Downes* and *Dorr*.[10] On the other hand, the manner in which the Court dealt with the First Amendment issue raised in the case implied an understanding on its part that freedom of speech is as protected in Puerto Rico as anywhere in the United States,[11] which understanding would, of course, be fully consistent with the Court's extensive dicta in *Downes*.

---

8. See the discussion of this point in Balzac v. Porto Rico, 258 U.S. 298, 305, 42 S.Ct 343, 66 L.Ed. 627 (1922).

9. The fact that the right to due process of law is fully applicable in Puerto Rico was very recently reaffirmed in Calero-Toledo v. Pearson Yacht Leasing Co., —— U.S. ——, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974).

10. In dictum the Court also indicated that no constitutional right to indictment by grand jury existed in unincorporated territories, 258 U.S. at 313, 42 S.Ct. 343. *See* Dowdell v. United States, 221 U.S. 325, 332, 31 S.Ct. 590, 55 L.Ed. 753 (1911).

11. *See* 258 U.S. at 314, 42 S.Ct. 343.

It has been said that a series of Supreme Court opinions dealing with cases arising in either the Philippines [12] or Puerto Rico established that the Sixth and Seventh Amendment rights to trial by jury, the Fifth Amendment right to indictment by a grand jury, the Sixth Amendment right to confront witnesses, the Fifth Amendment protection against double jeopardy, and the protections against bills of attainder and ex post facto laws, were all inapplicable to unincorporated territories.[13] Of course, as discussed above, *Balzac* held that trial by jury, and indicated that indictment by a grand jury, were not constitutionally required in Puerto Rico.[14] But a careful review of the cases cited to support the proposition that the other rights listed above are unavailable in an unincorporated territory, demonstrates instead that the proposition has no actual case support.

Both Kepner v. United States, 195 U. S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1904), and Grafton v. United States, 206 U.S. 333, 27 S.Ct. 749, 51 L.Ed. 1084 (1907), dealt with claims that an individual was twice put in criminal jeopardy. In both cases the Court expressly decided to leave open the question of whether the Fifth Amendment protection against double jeopardy applied in the Philippines because identical protection was provided under local law. *See* 195 U.S. at 124, 24 S.Ct. 797, 206 U.S. at 345, 27 S.Ct. 749. In Dowdell v. United States, 221 U.S. 325, 31 S.Ct. 590, 55 L. Ed. 753 (1911), the Court did not find

unavailable in the Philippines the protection of the right to confront witnesses, but instead assumed that such protection was available, although it did not indicate whether it was applying the constitutional provision, or a provision of local law which conferred the identical right, 221 U.S. at 330. In Puerto Rico v. The Shell Co., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937), the Court held, in relevant part, that application of the Sherman Anti-Trust Act in Puerto Rico would not create a risk of double jeopardy because the Fifth Amendment protection, or the similar protection afforded by the Puerto Rico Organic Act of 1917, would bar a second prosecution in the situation where an individual violated both federal and local anti-trust laws. *See* 302 U.S. at 264, 58 S.Ct. 167. In summary, the cases cited say nothing about bills of attainder and ex post facto laws, leave open the question as regards double jeopardy, and confrontation rights, and together with *Dorr* and *Balzac*, actually hold inapplicable to unincorporated territories only the rights to jury trial and indictment by a grand jury. On the other hand, these cases, particularly *Balzac*, clearly indicate that the right to due process of law applies in such territories, and indicate somewhat more generally that other "fundamental" rights, such as the right to freedom of speech, also apply.[15]

The First Circuit has been guided by *Balzac*, applying to Puerto Rico the right to due process of law, *see* Figueroa Ruiz v. Delgado, 359 F.2d 718 (1st Cir.

---

12. Since the Court grouped the Philippines and Puerto Rico together in the category of unincorporated territory it may be presumed that cases applying that doctrine to the Philippines are of precedential value in determining questions arising under the doctrine in Puerto Rico.

13. *See* Report of the United States-Puerto Rico Commission on the Status of Puerto Rico (1966) at 45, De Passallacqua, The Constitutional and Political Status of the Island of Puerto Rico, 10 Revista de Derecho Puertorriqueno 11, 67 (1970), Leibowitz, The Applicability of Federal Law to the Commonwealth of Puerto Rico, 56 Geo.L.J.

219, 242 (1967). But for a strong contrary view, *see* Helfeld, How Much of the Federal Constitution is Likely to be Held Applicable to the Commonwealth of Puerto Rico?, 39 Revista Juridica de la Universidad de Puerto Rico 169, 172 (1970).

14. *See also* Dowdell v. United States, *supra*, at 332, 31 S.Ct. 590.

15. *See also* Weems v. United States, 217 U. S. 349, 30 S.Ct. 544, 54 L.Ed. 793 (1910), which dealt with a punishment found "cruel and unusual" under a provision of the Philippine bill of rights construed to be identical to the Eighth Amendment to the United States Constitution.

1966), and finding inapplicable the rights both to a jury trial, and, a fortiori, to a unanimous jury verdict, in criminal cases, *see* Fournier v. Gonzalez, 269 F.2d 26 (1st Cir. 1959). At the district court level very recent cases have applied to Puerto Rico the right of "one person, one vote" grounded in equal protection analysis under either the Fifth or Fourteenth Amendments, Ortiz v. Hernandez Colon, F.Supp. (D.P.R.1974) (three judge court),[16] and the rights of free speech and assembly found in the First Amendment, Marin v. University of Puerto Rico (Marin II), 377 F.Supp. 613 (D.P.R.1973) (three judge court), Torres Cintron v. State Board of Education (D.P.R.1974) (three judge court).

The advent of Commonwealth has had no express impact upon the issue under discussion. The Congress of the United States conditioned approval of the Commonwealth Constitution upon "conform[ity] with the applicable provisions . . . of the Constitution of the United States",[17] and the Commonwealth Constitution, in its preamble, pledges fidelity to the principles of democracy, and "loyalty to the principles of the Federal Constitution." None of this makes clear just which specific provisions of the United States Constitution apply in Puerto Rico. But it does follow undeniably that at least those "fundamental" protections of the United States Constitution, which were restraints upon the power of the pre-commonwealth government, remain in effect after formation of the Commonwealth and restrict its power. As said by the First Circuit in 1953:

"No doubt under the Organic Act of 1917, . . . the insular government was subject to the due process clause of the Fifth Amendment. . . . [T]he government of the newly created Commonwealth of Puerto Rico is subject to 'the applicable provisions of the Constitution of the United States.' That must mean that the people of Puerto Rico, who remain United States citizens, are entitled to invoke against the Commonwealth of Puerto Rico the protection of the fundamental guarantee of due process of law, as provided in the federal Constitution. For our present purposes it is unnecessary to determine whether it is the due process clause of the Fifth Amendment or that of the Fourteenth Amendment which is now applicable; the important point is that there cannot exist under the American flag any governmental authority untrammeled by the requirements of due process of law as guaranteed by the Constitution of the United States." Mora v. Mejias, 206 F.2d 377, 382 (1st Cir. 1953).[18]

The question which was avoided by the court in Mora v. Mejias, whether the Commonwealth is now subject to the Fourteenth Amendment, rather than to, for example, the Fifth Amendment, has not been resolved. The federal courts have deliberately remained vague. The approach taken in Mora v. Mejias of finding it unnecessary to make a choice was approved in Calero-Toledo v. Pearson Yacht Leasing Co., *supra*.

Perhaps one of the principal reasons why resolution of the question of whether the Fourteenth Amendment now governs the application of federal constitutional rights to Puerto Rico has been avoided is the fact that expressly, and historically, the Fourteenth Amendment operates as a restraint on the power of "states". Applying this amendment to

---

16. Since Puerto Rico became a Commonwealth the federal courts have carefully refrained from deciding whether due process rights apply through the Fifth Amendment or the Fourteenth. *See, e. g.*, Calero-Toledo v. Pearson Yacht Leasing Co., — U.S. —, 94 S.Ct. 2080, 40 L.Ed.2d 452.

17. *See* 48 U.S.C.A. § 731d, Calero-Toledo v. Pearson Yacht Leasing Co., *supra*, — U.S. at —, 94 S.Ct. 2080 n. 5.

18. The substance of this quote was quite recently cited with approval by the Supreme Court in Calero-Toledo v. Pearson Yacht Leasing Co., *supra*, — U.S. at —, 94 S.Ct. 2080 n. 5.

Puerto Rico might well have political overtones. On the other hand, continued application of the doctrine of "unincorporated territories" is perceived as both historically and politically anachronistic, and even demeaning to the present status of the Commonwealth.[19]

Curiously, despite the difference in outward appearance between the Fourteenth Amendment provision that "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws", and the doctrine announced in Downes v. Bidwell that only "fundamental" provisions of the Constitution apply in "unincorporated territories" like Puerto Rico, the practical and theoretical application of these two standards has been remarkably similar. It has been held that the Fourteenth Amendment guarantees only those personal rights which are "fundamental" or "implicit in the concept of ordered liberty". *See* Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937), Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L. Ed.2d 491 (1968). Analogously, in Downes v. Bidwell, those rights which would be protected in an unincorporated territory were described as, "immunities [which] are indispensable to a free government", 182 U.S. at 282–283, 21 S.Ct. at 785 (opinion of Brown, J.), or, "restrictions of so fundamental a nature that they cannot be transgressed", 182 U.S. at 291, 21 S.Ct. at 788 (opinion of Justices White, Shiras and McKenna), and in Balzac v. Porto Rico the Court spoke in terms of "certain fundamental rights declared in the Constitution". This parallelism has not been lost upon the Supreme Court. In *Downes* itself Mr. Justice Brown, describing rights which are not fundamental, listed some such rights, adding "some of which have already been held by the States to be unnecessary to the proper protection of individuals." 182 U.S. at 283, 21 S.Ct. at 785. And, in Dowdell v. United States, *supra*, the Court found no requirement of indictment by grand jury and cited Hurtado v. California, 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884), which found that states are not required by the Constitution to afford the protection of grand jury indictment. In fact, no right held inapplicable to unincorporated territories was contemporaneously held applicable to the states. In addition to indictment by grand jury, the rights specifically held inoperative in such territories were jury trial and a unanimous jury. But the right to trial by jury was not found "fundamental" in the sense

---

19. In Granville-Smith v. Granville-Smith, 349 U.S. 1, 7, 75 S.Ct. 553, 99 L.Ed. 773 (1955), in the course of deciding a case which arose in the Virgin Islands, the Court discussed the matter of incorporated versus unincorporated territories, but neatly avoided voicing an opinion on the status of the Commonwealth by observing only that "pre-Commonwealth Puerto Rico" was an unincorporated territory. Later, in Reid v. Covert, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), Mr. Justice Black, announcing the judgment of the Court and speaking for four members of the Court, criticized the Insular Cases, saying:

"Moreover, it is our judgment that neither the cases nor their reasoning should be given any further expansion. The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become

inconvenient or when expediency dictates otherwise is a very dangerous doctrine. . . ." 354 U.S. at 14, 77 S.Ct. at 1229.

In Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), the Court declined to consider whether the Territorial Clause of the United States Constitution, Art. IV, § 3, continues to apply to the Commonwealth. *See* 384 U.S. at 646 n. 5, 86 S.Ct. 1717.

Finally, quite recently in Pearson Yacht Leasing the Court avoided deciding whether the Fifth or Fourteenth Amendments apply to the Commonwealth, *see* —— U.S. at ——, 94 S.Ct. at 2080 n. 5 but went on to hold that "enactments of the Commonwealth of Puerto Rico [are] 'State statute[s]' for purposes of the Three Judge Court Act . . . . —— U.S. at ——, 94 S.Ct. at 2087.

of incorporation into the Fourteenth Amendment until Duncan v. Louisiana, *supra,* which was decided in 1968, some time after Balzac v. Porto Rico and Fournier v. Gonzalez, *supra,* were handed down. And the right to a unanimous jury verdict has recently been held inapplicable to the states under the Fourteenth Amendment in Apodaca v. Oregon, 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed. 2d 184 (1972).[20]

█ Finding such great similarity in the practical and theoretical application of the tests used as to both states and unincorporated territories, we may assume that the notion of "fundamental rights", which has undergone such a metamorphosis in the context of interpretation of the Fourteenth Amendment,[21] must be deemed to have had a similar expansion as to Puerto Rico. In addition, we think that we may safely assume that when a personal right has been found applicable to the states via the Fourteenth Amendment, we may then assume that such right is applicable to Puerto Rico, regardless of the theoretical means used to achieve such a result. After all, citizens of Puerto Rico, in common with citizens of states, are citizens of the United States. In addition, historically when fundamental rights are involved, courts have been hesitant to find the protection of the United States Constitution lacking, and this is no less true since the advent of Commonwealth. *See* Figueroa Ruiz v. Delgado, *supra.* Nothing in the course of the creation of a new political status for Puerto Rico in 1950–1952 indicated that such a drastic change in regard to protection of fundamental personal liberties was contemplated.[22] On the whole, therefore, while consideration must be given to the unique history and status of Puerto Rico, rights applicable to the states under the Fourteenth Amendment will be found similarly applicable to the Commonwealth.[23]

20. In Balzac v. Porto Rico the Court also indicated that the Seventh Amendment right to trial by jury in civil cases where juries were traditionally provided under Common Law did not apply to Puerto Rico. But this right has also been held inapplicable to the states under the Fourteenth Amendment, *see, e. g.,* Hardware Dealers Mutual Fire Ins. Co. v. Glidden Co., 284 U.S. 151, 52 S. Ct. 69, 76 L.Ed. 214 (1931), Wagner Electric Mfg. Co. v. Lyndon, 262 U.S. 226, 43 S.Ct. 589, 67 L.Ed. 961 (1923), Minneapolis & St. L. R. R. v. Bombolis, 241 U.S. 211, 36 S.Ct. 595, 60 L.Ed. 961 (1916), *see also* Colgrove v. Battin, 413 U.S. 149, 169 n. 4, 93 S.Ct. 2448, 37 L.Ed.2d 522 (1973) (Marshall, J., dissenting).

21. *Compare, for example,* Malloy v. Hogan, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964) *with* Adamson v. California, 332 U.S. 46, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) ; Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) *with* Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595 (1942). Although the doctrinal bases for applying to the states rights contained in the Bill of Rights has undergone some changes over time and has been the subject of considerable debate (*see, e. g.,* Adamson v. California, 332 U.S. 46, 68, 67 S.Ct. 1672, 91 L.Ed. 1903 (1947) (Black, J., dissenting)), the Court has not abandoned the practice of applying those rights to the states selectively. Were this practice to be abandoned and the Court to adopt a position akin to complete incorporation of the Bill of Rights into the Fourteenth Amendment, the precise effect upon the Commonwealth of Puerto Rico is unclear, but a narrowing of the scope of rights enforceable in Puerto Rico would be unlikely.

22. *See* Helfeld, How Much of the Federal Constitution is Likely to be Held Applicable to the Commonwealth of Puerto Rico?, *supra,* at 170 n. 4.

23. One member of the panel, Judge Coffin, would be somewhat less categoric than this statement suggests. In his view, while protections given citizens of the states under the Fourteenth Amendment are at least presumptively applicable to the Commonwealth, as the historical analysis in the text illustrates, he would not foreclose a measure of flexibility in the sensitive federal-Commonwealth relations area if such a stance would depart from the precedents of higher federal courts. He would leave open the possibility of recognizing a difference in rights existing in the states vis-a-vis Puerto Rico in the event that application to Puerto Rico of a particular right in precisely the way it would be applied in the states would do demonstrably grave damage to the political, social, and economic status of the Commonwealth or the federal-Commonwealth relationship.

■ In light of all that has been said above, we have no doubt but that the rights of personal privacy as set out in Roe v. Wade and Doe v. Bolton are fully applicable to the Commonwealth. The Court stated that, "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty' . . . are included in [the] guarantee of personal privacy." 410 U.S. at 152, 93 S.Ct. 726, and went on to hold that, "This right of privacy . . . is broad enough to encompass a woman's decision whether or not to terminate her pregnancy." 410 U.S. at 153, 93 S.Ct. at 727. Even under the doctrine of "unincorporated territories" as explicated in Downes v. Bidwell back in 1901 the above finding of the Court in Roe v. Wade clearly indicates that the rights of a pregnant woman come within the range of those "fundamental" personal rights which the Court in *Downes* thought protected in such territories. The historical trend in American legal thought which has led to the expansion of judicial protection of the individual only confirms this view. Alternatively, if Puerto Rico is viewed as a "state" for purposes of the Fourteenth Amendment, or is, perhaps, thought to be affected directly by the Bill of Rights of the United States Constitution, without the limitation of the doctrine of unincorporated territories, then the applicability of Roe v. Wade to the Commonwealth is even more obvious.

In the arguments opposing the above conclusion, our attention has been principally drawn to the possibility of offending the strong moral and religious views of the majority of the citizens of Puerto Rico. It has been pointed out that, unlike the United States as a whole, Puerto Rico's population is predominantly Catholic. But this overlooks the fact that the abortion decision of the Supreme Court has been enormously

controversial in the states of the Union, and has been assailed by large numbers of persons, including many Catholics. But the Court set out in Roe v. Wade with full knowledge of the moral and religious overtones of the case.

> "We forthwith acknowledge our awareness of the sensitive and emotional nature of the abortion controversy, of the vigorous opposing views, even among physicians, and of the deep and seemingly absolute convictions that the subject inspires.
>
> \*    \*    \*    \*    \*    \*
>
> "Our task, of course, is to resolve the issue by constitutional measurement, free of emotion and of predilection. We seek earnestly to do this. . . ." 410 U.S. at 116–117, 93 S. Ct. at 708.

The mere fact that anti-abortion views may constitute a majority position in one place does not negate the necessity for protecting the fundamental right to be free to choose to act according to one's own beliefs concerning this question, free from coercion by the government of that place. Indeed, the need for constitutional protection is heightened, rather than diminished, when it is the minority who seek that protection. Moreover, while protecting the rights of those who seek abortions, the decision of the Court in Roe v. Wade compels nothing of those who believe abortions wrongful.

■ To protect highly personal rights which are constitutionally shielded is the duty of the courts, unless it may be demonstrated that to do so would run afoul of a "compelling" state interest. The Supreme Court found that no interest which could be put forward by the state-defendants in Roe v. Wade and Doe v. Bolton was sufficiently compelling to overcome completely the privacy rights of the plaintiffs. The fact that

This difference in outlook does not diminish the unanimity of support for the result reached in this case, for the issue of a woman's right to terminate her pregnancy does not affect to any substantial degree federal-Commonwealth relationships or any aspect of Puerto Rico's heritage and status so as to outweigh the protection of rights deemed "fundamental" and "implicit in the concept of ordered liberty".

officials of the Commonwealth of Puerto Rico are the defendants here does not materially alter the equation. We think that the kind of objections which may be made on behalf of the Commonwealth were considered and rejected by the Court in Roe v. Wade and we are therefore bound by that Court's holding.

## IV. The Merits

Reaching the merits, at last, the question to be resolved is whether the Commonwealth statutes which deal with abortions, 33 L.P.R.A. §§ 1051–1054, can be construed so as to meet the constitutional tests for legislation of this type set out in Roe v. Wade. As the Court there said:

"(a) For the stage prior to approximately the end of the first trimester, the abortion decision and its effectuation must be left to the medical judgment of the pregnant woman's attending physician.

"(b) For the stage subsequent to approximately the end of the first trimester, the State, in promoting its interest in the health of the mother, may, if it chooses, regulate the abortion procedure in ways that are reasonably related to maternal health.

"(c) For the stage subsequent to viability the State, in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." 410 U.S. at 164–165, 93 S.Ct. at 732.

The prohibition against prescribing, advising, inducing or practicing abortion, contained in 33 L.P.R.A. § 1051 is subject to an exception for "therapeutic prescription by a physician duly authorized to practice medicine in Puerto Rico, for the purpose of preserving health or life". The proscriptions of section 1052 are expressly made subject to the provisions of section 1051, presumably including its exception clause, but sections 1053 and 1054 contain no reference to section 1051. We will therefore consider these two sets of statutes separately.

The phrase "health or life", contained in section 1051, is found in the abortion statutes of some states, and has been the subject of in depth interpretation. In United States v. Vuitch, 402 U.S. 62, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971), the Supreme Court upheld against vagueness attack the abortion statute of the District of Columbia, which permitted abortions to preserve the mother's "life or health". The Court found that the "general usage and modern understanding of the word 'health' . . . includes psychological as well as physical well-being." 402 U.S. at 72, 91 S.Ct. at 1299. The Court went on to say that, "whether a particular operation is necessary for a patient's physical or mental health is a judgment that physicians are obviously called upon to make routinely whenever surgery is considered." 402 U.S. at 72, 91 S.Ct. at 1299 (footnote omitted). Subsequently, in Doe v. Bolton the Court relied upon *Vuitch* to construe the Georgia statute, which allowed an abortion by a physician when "based upon his best clinical judgment . . . an abortion is necessary." 410 U.S. at 191, 93 S.Ct. at 747. As the Court said:

"We agree with the District Court, 319 F.Supp. [1048], at 1058, that the medical judgment may be exercised in the light of all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well-being of the patient. All these factors may relate to health. This allows the attending physician the room he needs to make his best medical judgment. And it is room that operates for the benefit, not the disadvantage, of the pregnant woman." 410 U.S. at 192, 93 S.Ct. at 747.

We think that section 1051 is subject to the same interpretation. As thus interpreted, we think that section 1051, and section 1052, since it is grounded upon section 1051, would comport with the standards set out in Roe v.

Wade.[24] Thus, for example, during the first trimester section 1051 would presume that the decision to have an abortion, made by the woman in consultation with her physician, was "therapeutic" and therefore within the exception clause of that section. Indeed, we understand counsel for defendants, in written, and particularly in oral argument before this court, as advising that this is the position of the Commonwealth.

 When we turn to consider sections 1053 and 1054, however, we reach a different conclusion. Unlike section 1052, these two sections do not refer to section 1051 and its broad exception clause, discussed above. Instead these sections have their own exception. They make procuring, committing, or submitting to a miscarriage [25] illegal unless "necessary to preserve [the woman's] life". Although the Commonwealth argues that sections 1053 and 1054 are modified by section 1051's provisions, we think such an interpretation unreasonable. The plain language of these sections, their possession of an entirely separate and distinct exception clause, and their lack of reference to section 1051, all make perfectly clear that these two sections must stand or fall on their own. Standing thus on their own, we think these statutes constitutionally defective. By conditioning legal abortion solely upon preservation of the life of the mother they sweep too broadly and take too little account of the right of the pregnant woman, particularly in her first two trimesters, to seek an abortion to vindicate her privacy or preserve her health,[26] under circumstances where her interests outweigh the interest of the state in preserving the life of the unborn child. *See* Roe v. Wade, 410 U.S. at 164–165, 93 S.Ct. 705.

From the foregoing, we conclude that 33 L.P.R.A. §§ 1053 and 1054 must be declared unconstitutional and void and enforcement of these two sections must be enjoined. No relief will be granted as to sections 1051 and 1052.

---

24. Although we have decided not to abstain, in deciding the merits as to these two sections we reach a quite similar result.

25. In Henrie v. Derryberry, 358 F.Supp. 719 (N.D.Okla.1973) (three judge court), an abortion statute which used the term "miscarriage" was treated in a manner which in-

dicated that "miscarriage" was synonomous with "abortion".

26. We disagree with the implication in Henrie v. Derryberry, *supra*, at 726, that the phrase preservation of the "life of the mother" can be construed to include consideration of her health. Plain language cannot be stretched so far.