**Decided March 31, 1983**

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

APPELLATE DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF THE NORTHERN MARIANA ISLANDS, | ) ) ) | DCA NO. 82-9003<br>CTC CR. CASE NO. 81-116 |
| Plaintiff-Appellee, | ) ) | |
| vs. | ) ) | OPINION |
| DANIEL ATALIG, | ) ) | |
| Defendant-Appellant. | ) ) | |

Attorney for Appellant: William M. Fitzgerald
P. O. Box 909
Saipan, NMI 96950

Attorney for Appellee: Rexford C. Kosack
Deputy Attorney General
Commonwealth of the
Northern Mariana Islands
Saipan, NMI 96950

Before: LAURETA and GILLIAM, District Judges and
MUNSON, Designated Judge*

LAURETA, District Judge:

Daniel Atalig appeals his conviction by bench
trial in the Commonwealth Trial Court of marijuana possession
in violation of 63 Trust Territory Code § 292(3)(c).
Appellant unsuccessfully demanded a jury trial pursuant to
Duncan v. Louisiana, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d
1412 (1968) and Baldwin v. New York, 399 U.S. 66, 90 S.Ct.
1186, 26 L.Ed.2d 437 (1970). Duncan decided that in state

*Chief Justice Alex Munson of the High Court of the
Trust Territory of the Pacific Islands, designated by
the Chief Judge of the Northern Mariana Islands Commonwealth
Trial Court to serve as a judge of the Northern Mariana
Islands for purposes of 48 U.S.C. § 1694b.

555

court prosecutions for serious criminal offenses the Sixth Amendment right to jury trial is a fundamental constitutional right guaranteed by the Fourteenth Amendment's Due Process Clause. 391 U.S. at 149, 156, 88 S.Ct. at 1447, 1451. Baldwin established that offenses punishable by more than six months' imprisonment are among the serious offenses to which the Duncan jury trial right attaches. 399 U.S. at 69, 73-74, 90 S.Ct. at 1888, 1890-1891; id. at 74, 90 S.Ct. at 1891 (Black and Douglas, J.J., concurring in the judgment). The maximum penalty for violating § 292(3)(c) is one year imprisonment, a $1,000 fine or both.

The Commonwealth Trial Court denied appellant's jury trial demand on the basis of § 501(a) of the Covenant to Establish a Commonwealth of the Northern Mariana Islands in Political Union with the United States of America (the Covenant), Pub.L.No. 94-241, 90 Stat. 263 (1976). reprinted in 48 U.S.C. § 1681 note. Although Covenant § 501(a) recognizes that the Sixth Amendment and the Fourteenth Amendment's Due Process Clause apply in the Northern Mariana Islands (NMI), it provides that jury trials in criminal prosecutions under NMI law are required only when NMI law so mandates. Under 5 Trust Territory Code § 501(1), jury trials are available only for offenses punishable by more than five years' imprisonment or a $2,000 fine. Covenant § 501(b) indicates that the United States Congress has the power to approve § 501(a) notwithstanding the applicability of certain constitutional provisions in the NMI.

556

The issue presented[1] is whether the fundamental due process right to jury trial guaranteed by the Sixth and Fourteenth Amendments applies in criminal prosecutions under NMI law notwithstanding Covenant § 501(a) and 5 Trust Territory Code § 501(1). We conclude that it does. On that ground, we reverse and remand for a new trial. In so deciding we specifically hold as follows:

1. Covenant § 501(a) and 5 Trust Territory Code § 501(1) are unconstitutional to the extent that they deny the right to jury trial guaranteed by the Sixth Amendment and the Fourteenth Amendment's Due Process Clause;

2. Covenant § 501(b) is unconstitutional to the extent that it purports to authorize Congress to approve § 501(a)'s denial of the constitutional jury trial right.

///

///

///

///

///

///

///

///

///

## I. FACTS

Appellant is a Trust Territory citizen residing on Rota in the NMI. On September 12, 1981, he rode a commercial airline flight within the NMI from Rota to Saipan. He shipped two boxes as cargo. The boxes contained deer meat and plastic bags filled with approximately five pounds of marijuana. After recovering the boxes at the Saipan airport's baggage and cargo claim area, appellant presented them at the regular customs inspection area to an agricultural quarantine inspector. After appellant complied with the inspector's request to open the boxes, the inspector discovered the marijuana.

Appellee Commonwealth of the Northern Mariana Islands (the government) charged appellant by information with possession of 2.2 pounds or more of marijuana in violation of 63 Trust Territory Code § 292(3)(c). On February 25, 1982, the Commonwealth Trial Court denied appellant's demand for jury trial and his motion to suppress the marijuana. Appellant pleaded nolo contendere on March 1, 1982. On the same date the court convicted appellant and sentenced him to one year probation with special conditions that he serve 30 days in jail and pay a $1,000 fine. Appellant noticed an appeal on March 10, 1982. The court stayed execution of sentence during the pendency of the appeal.

## II. OVERVIEW OF THE UNITED STATES-NMI RELATIONSHIP

■ A brief overview of the relationship between the United States and the NMI is appropriate to frame the constitutional issue which this appeal presents. The NMI is part of the Trust Territory of the Pacific Islands, which the United States has administered since 1947 as a United Nations trusteeship under the Trusteeship Agreement for the Former Japanese Mandated Islands, July 18, 1947, 61 Stat. 3301, T.I.A.S. No. 1665, 8 U.N.T.S. 189 (the Trusteeship Agreement). The United States disclaims de jure sovereignty over the Trust Territory and is obligated to treat the territory's people "with no less consideration than it would govern any part of its sovereign territory." People of Enewetak v. Laird, 353 F.Supp. 811, 819 (D.Haw. 1973), quoting 2 U.N..SCOR (116th mtg.) at 473 (1947)(statement by the United States Representative to the United Nations Security Council). The relationship between the United States and the people of the Trust Territory has been accurately described as "a fiduciary one... [in which] the interests of the inhabitants of the territory become paramount." Leibowitz, The Marianas Covenant Negotiations, 4 Fordham Int'l L.J. 19, 79 n.236 (1980); quoting Comment, International Law and Dependent Territories: The Case of Micronesia, 50 Temple L.Q. 58, 60 (1976).

Under Trusteeship Agreement Article 6.1, the United States must promote the development of self-government or independence in accordance with the freely expressed wishes of the Trust Territory's people.[2] This duty has been recognized as the most fundamental obligation of the trusteeship. See, e.g., Northern Mariana Islands: Hearing on H.J. Res. 549 before the Subcommittee on General Legislation of the United States Senate Committee on Armed Services, 94th Cong. 1st Sess. 152 (1975)(Senate General Legislation SubCommittee Hearing)(joint written answer by executive branch officials to a question by Senator Hart); J. Murray, The United Nations Trusteeship System 211, 239-240 (1957).[3] The performance of this obligation during the trusteeship's first three decades did not escape judicial comment.[4] Nevertheless, the mid-1970's marked the beginning of a transition toward greater self-government in the NMI.

The people of the NMI have historically sought closer and formal political association with the United States. See generally S.Rep. No. 433, 94th Cong. 1st Sess. 45(1975)(S.Rep. No. 433); id. at 137-158 (Mariana Islands District Legislature resolutions endorsing permanent political union with the United States). In December 1972, negotiations for the development of formal association commenced[5] between the United States and a Marianas Political Status Commission created by the Mariana Islands District

560

Legislature.[6] These negotiations[7] resulted in the signing
of the Covenant on February 15, 1975. The NMI approved the
document by a 78.8 percent vote in a plebiscite held on June
17, 1975. See generally S.Rep.No. 433, supra, at 63-64; id.
at 413-414 (letter to President Ford from the United States'
Plebiscite Commissioner). On March 24, 1976, the United
States Congress enacted the Covenant as law. See generally
Note, United Nations Trusteeship, 21 Harv.Int'l L.J. 204
(1977).

Pursuant to Covenant § 101, the NMI will formally
become a self-governing commonwealth under United States
sovereignty upon termination of the trusteeship. Although
the trusteeship continues notwithstanding the original
intention to terminate it by 1981,[8] most of the Covenant is
already in effect. Since January 9, 1978, a three-branch
commonwealth government has operated under a locally drafted
and adopted Northern Mariana Islands Constitution.[9] The
local constitution and numerous Covenant provisions took
effect on that date pursuant to a presidential proclamation
required by Covenant § 1003(b). See Proclamation No. 4534,
42 Fed. Reg. 56593 (1977), reprinted in 48 U.S.C. § 1681
note.

One of the Covenant sections which became operative
was § 501, which concerns the applicability of the United
States Constitution. Section 501(a) states in relevant
part:

> To the extent that they are not
> applicable of their own force,
> the following provisions of the
> Constitution of the United States
> will be applicable within the
> Northern Mariana Islands as if
> the Northern Mariana Islands were
> one of the several states...
> Amendments 1 through 9, inclusive;
> ... Amendment 14, section 1; ...
> provided, however, that neither
> trial by jury nor indictment by
> grand jury shall be required in
> any civil action or criminal pro-
> secution based on local law
> (emphasis added).

Section 501(b) authorizes the United States Congress to
approve § 501(a):

> The applicability of certain provi-
> sions of the Constitution of the
> United States to the Northern Mariana
> Islands will be without prejudice
> to the validity of and the power of
> the Congress of the United States
> to consent to Sections 203, 506 and
> 805 and the proviso in Subsection (a)
> of this Section.

As indicated above, 5 Trust Territory Code § 501(1) is the
governing NMI statute concerning criminal jury trials.[10]
By providing for jury trials only for offenses punishable
by more than 5 years' imprisonment or a $2,000 fine, this
statute is clearly inconsistent with Duncan and Baldwin.
We now turn to the issues raised by Covenant § 501 and 5
Trust Territory Code § 501(1).

/// .

///

## III. DISCUSSION

Congress supported § 501(a)'s jury trial language on the basis of decisions represented by Balzac v. Puerto Rico, 258 U.S. 298, 42 S.Ct. 343; 66 L.Ed. 627 (1922) and Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904). S.Rep.No. 433, supra, at 74. Balzac and Dorr are part of a pre-Duncan line of cases collectively known as the Insular Cases.[11] Under the analytical framework developed in the Insular Cases, the Constitution applies fully in incorporated territories[12] but only fundamental constitutional rights apply of their own force in unincorporated territories.[13] E.g., Examining Board of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 599 n.30, 96 S.Ct. 2264, 2280 n.30, 49 L.Ed.65 (1976).[14]

Balzac declared that the guarantee against the deprivation of life or liberty without due process of law is one of the fundamental constitutional rights which inherently apply in unincorporated territories. 258 U.S. at 312, 42 S.Ct. at 348. Implicitly and necessarily differentiating the right to due process, the court held that the Sixth Amendment right to jury trial is a non-fundamental right which does not apply of its own force. Id. at 304-305, 309-310, 313, 42 S.Ct. at 347-348. This unanimous holding followed prior rulings in Dorr[15] and in Hawaii v. Mankichi, 190 U.S. 197, 218, 23 S.Ct. 787, 791, 47 L.Ed. 106 (1903); id. at 218-220, 23 S.Ct. at 791-792 (White and McKenna, J.J., concurring).

Appellant contends that _Duncan_ overruled the jury trial holdings in _Balzac_, _Dorr_ and _Mankichi_ (the _Insular Cases_' jury trial doctrine). He submits that therefore the due process right to jury trial recognized in _Duncan_ and _Baldwin_ prevails over conflicting provisions of Covenant § 501 and 5 Trust Territory Code § 501(1).

The government argues that _Duncan_ did not overrule the _Insular Cases_' jury trial doctrine. It adds that the Covenant represents the United States' fulfillment of its obligation under Trusteeship Agreement Article 6.1 to ensure that the people of the NMI achieve self-government. Reasoning from this premise, the government asserts that it would be inconsistent with that obligation to "force" jury trials upon the people of the NMI notwithstanding Covenant § 501(a).

The constitutional issues which we confront here were discussed in admitted[16] dicta[17] by another panel of this Court in _Okaruru v. Commonwealth of the Northern Mariana Islands_, DCA No. 80-9002 (D.N.M.I.App.Div. 1981). The _Okaruru_ majority declared that the _Insular Cases_' jury trial doctrine survived _Duncan_. The concurrence rejected this view but relied upon Covenant § 105 and § 501(a) in denying Okaruru's jury trial claim.

Although dictum may be followed if it is sufficiently persuasive, it is not controlling and may be disapproved. E.g., _Humphrey's Executor v. United States_, 295

564

U.S. 602, 626-627, 55 S.Ct. 869, 873-874, 79 L.Ed. 1611
(1935); Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 399-400,
5 L.Ed. 257, 290 (1821). For reasons which follow, we
respectfully disapprove the Okaruru dicta.

Our analysis of the parties' arguments proceeds in
two steps. First, we determine that Duncan effectively
overruled the Insular Cases' jury trial doctrine. Second,
after ascertaining the state of the law we assess the
constitutionality of Covenant § 501 and 5 Trust Territory
Code § 501(1) to the extent required by this appeal.

A. Duncan v. Louisiana
 and the Insular Cases
 Jury Trial Doctrine

As indicated above, the Insular Cases' jury trial
doctrine rested upon the premise that the Sixth Amendment
right to jury trial was a non-fundamental right which was
not a component of due process. During the same era in
which the Supreme Court decided the Insular Cases, the court
similarly declared that the right to jury trial was a non-
fundamental right which did not apply to states through the
Fourteenth Amendments's Due Process Clause. E.g., Maxwell v.
Dow, 176 U.S. 581, 603-605, 20 S.Ct. 448, 457-458, 44 L.Ed. 597
(1900). In a thorough review of Duncan and the Insular Cases,
a three-judge district court in Puerto Rico correctly observed
that fundamental constitutional rights have been historically

coextensive in states and unincorporated territories. No right held to be non-fundamental and inapplicable in territories has ever been contemporaneously held to be a fundamental right with respect to states. _Montalvo v. Colon_, 377 F.Supp. 1332, 1340 (D.P.R. 1974)(per curiam). Therefore, we reject the government's position that different constitutional definitions of the term "fundamental rights" apply in states and territories.[18]

Duncan reaffirmed that the Supreme Court's Sixth Amendment decisions "are always subject to reconsideration, a fact amply demonstrated by the instant decision." 391 U.S. at 158 n.30, 88 S.Ct. at 1452 n.30. As an example of the body of precedent which _Duncan_ disapproved, the court named _Maxwell v. Dow_, which _Dorr_[19] and the concurring justices in _Mankichi_[20] expressly relied upon. _Id._ at 154-155, 88 S.Ct. at 1450. In addition to noting _Maxwell's_ demise, the dissenting justices protested that the court had "overturned" _Mankichi_, which was the first _Insular Case_ to squarely decide the Sixth Amendment jury trial issue. _Id._ at 184-186, 88 S.Ct. at 1467-1468 (Harlan and Stewart, J.J., dissenting).

The _Insular Cases'_ jury trial doctrine had been seriously eroded even before _Duncan_ interred it. In _Reid v. Covert_, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957), the Supreme Court held unconstitutional a provision of the Uniform Military Justice Code which purported to authorize

court-martial jurisdiction for capital offenses over civilian dependents of overseas military personnel. The court rejected older cases which decided that the Constitution is inoperative outside of the United States. 354 U.S. at 5-14, 77 S.Ct. at 1225-1229 (plurality); id. at 56, 77 S.Ct. at 1251 (Frankfurter, J., concurring in the result); id. at 65-67, 77 S.Ct. at 1256 (Harlan, J., concurring in the result). One of these older cases was In Re Ross, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581 (1891). Ross was part of the asserted precedential support for the Insular Cases' jury trial doctrine. See Dorr, 195 U.S. at 144, 24 S.Ct. at 811. See also Downes v. Bidwell, 182 U.S. 244, 295n, 21 S.Ct. 770, 789n, 45 L.Ed. 1088 (1901) (White, Shiras and McKenna, J.J., concurring)(citing Ross in a case in which the right to jury trial was not an issue). In Reid, four justices also criticized the Insular Cases' rationale that only fundamental constitutional rights apply of their own force in unincorporated territories.[21] In addition, as pointed out by attorneys who advised the Marianas Political Status Commission and the NMI Constitutional Convention,[22] the Reid plurality expressly stated that the right to jury trial is a fundamental constitutional right. 354 U.S. at 9-10 and n.11, 13 and n.25, 77 S.Ct. at 1226-1227 and n.11, 1229 and n.25. The plurality underscored this conclusion by observing that the fear that jury trial might be abolished was one of the principal objections to the Constitution which ultimately led to the adoption of the

Bill of Rights. _Id._ at 9 n.12, 77 S.Ct. at 1226 n.12.

The common premise underlying _Balzac, Dorr,_ _Mankichi_ and _Maxwell_ was that the right to jury trial is not a fundamental due process right which applies of its own force against state or territorial governments. _Reid_ undermined that premise and _Duncan_ unmistakably repudiated it. We find support for our conclusion in the well-reasoned opinions of Judge Stern in _United States v. Tiede_, 86 F.R.D. 227 (U.S.C. Berlin 1979) and dissenting Judge Tamm in _King v. Morton_, 520 F.2d 1140 (D.C.Cir. 1975).[23]

### 1. United States v. Tiede

Relying upon _Duncan_ and _Reid_, _Tiede_ held that the right to jury trial is a fundamental due process right which the United States Court for Berlin must extend to alien civilian defendants. The court questioned whether the _Insular Cases'_ jury trial doctrine remained viable after _Reid_. It concluded that _Duncan_ authoritatively voided the _Insular Cases'_ premise that criminal jury trials are not fundamental in American law. 86 F.R.D. at 228, 249-252, 260.

In reasoning which also applies here, _Tiede_ recognized the constitutional insignificance of the fact that defendants were aliens[24] rather than United States citizens. Noting that the defendants in _Reid_ and in _Duncan_ were American

568

citizens, the United States argued that those cases did nót benefit the defendant German citizens in Tiede. The court held the Sixth Amendment's jury trial guarantee to all who are "accused" covers both citizens and aliens.[25] Id. at 259. This holding accords with settled Supreme Court jurisprudence. See, e.g., Wong Wing v. United States, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896).

The coextensive availability of jury trials to citizens and aliens also follows from the language of the Fourteenth Amendment due process guarantee of which the Duncan jury trial right is part. The Fourteenth Amendment's Due Process Clause unqualifiedly protects "any person". Thus, Duncan's explicit holding was that the due process right to jury trial extends "to all persons." 391 U.S. at 154, 88 S.Ct. 1450. The Supreme Court recently reaffirmed that aliens are "persons" protected by Fourteenth Amendment due process. Phyler v. Doe, ____, U.S. ____, ____, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982). As stated both in Balzac and in a case which recognized the applicability of the Constitution in the Trust Territory, "[i]t is the locality that is determinative of the application of the Constitution, in such matters of judicial procedure, and not the status of the people who live in it." 258 U.S. at 309, 42 S.Ct. at 347; accord, Ralpho v. Bell, 569 F.2d 607, 618 and n.65, reh. denied 569 F.2d 636 (D.C.Cir. 1977).

## 2. King v. Morton

In King v. Morton, 520 F.2d 1140 (D.C.Cir. 1975), a United States citizen claimed entitlement under the Constitution to a jury trial in the High Court of American Samoa. The majority suggested in dicta[26] that the Insular Cases' jury trial doctrine remains intact because Duncan and Baldwin "dealt with the right to jury trial in states rather than in unincorporated territories." Id. at 1147.

The government accurately characterizes the King majority's dicta as statements which "rewrite" rather than apply the Insular Cases' reasoning. Appellee's Brief at 19-23. Balzac declared that Justice White's concurrence in Downes v. Bidwell embodied the Supreme Court's "settled law". 258 U.S. at 305, 42 S.Ct. at 346. Justice White maintained that the initial analytical step in determining the applicability of a constitutional guarantee to an area is to assess the area's relation to the United States. 182 U.S. at 293, 21 S.Ct. at 789. As subsequent decisions confirm, this initial step requires a court to identify an area as an incorporated or an unincorporated territory. If the territory is unincorporated the question becomes whether the asserted right is constitutionally fundamental. If the right is fundamental, it applies of its own force. See Flores de Otero, 426 U.S. at 599 n.30, 96 S.Ct. at 2280 n.30; Balzac, 258 U.S. at 312, 42 S.Ct. at 348. The King

majority did not employ this analysis. Indicating that the applicability of a constitutional right "does not depend on" the right's status as fundamental or a territory's status as unincorporated, the majority instead relied upon the analysis of the _Insular Cases_ articulated by Justice Harlan's concurrence in _Reid v. Covert_. _See_ 520 F.2d at 1147-1148. Justice Harlan viewed the critical test as whether a territory's local circumstances and necessities make jury trials "impractical" or "anomalous". 354 U.S. at 75, 77 S.Ct. at 1260. This test is not the inquiry required by the _Insular Cases_. It is a reformulation in which only Justice Frankfurter arguably joined[27] and which a majority of the _Reid_ court did not adopt.[28]

We find guidance in Judge Tamm's dissent, which persuasively refutes the government's argument here that _Duncan_'s analysis with reference to "Anglo-American" jurisprudence implied the exclusion of insular legal systems from the court's holding. Footnote fourteen in _Duncan_'s majority opinion reviewed prior Supreme Court decisions which recognized the incorporation of Bill of Rights guarantees by the Fourteenth Amendment's Due Process Clause. Noting the variety of ways in which the Supreme Court had previously defined the term "fundamental right",[29] the _Duncan_ court explained that the pivotal test is whether a particular procedure is "necessary to an Anglo-American regime of ordered liberty." 391 U.S. at 149-150 n.14, 88 S.Ct. at

1447-1448 n.14. The reference to an "Anglo-American regime of ordered liberty" raises the question of whether _Duncan_ implicitly distinguished insular criminal justice systems.

Judge Tamm determined with respect to American Samoa that the answer to this question is no. His reasoning applies equally to the NMI. While conceding that the Supreme Court framed _Duncan_ in terms of Anglo-American jurisprudence, Judge Tamm correctly pointed out that "the threshold proposition in _Dorr_ and _Balzac_ that jury trial was _not_ fundamental was _also_ in terms of Anglo-American jurisprudence." 520 F.2d at 1157 (emphasis in original). He added that the American Samoan criminal justice process ensures such classically Anglo-American protections as the double jeopardy prohibition, the privilege against self-incrimination, the right to counsel, the right to a speedy public trial, the right to confront witnesses and prohibitions against excessive bail or cruel or unusual punishment. _Id._. The NMI criminal justice process also affords these safeguards. _See_ Northern Mariana Islands Constitution, Article I, Section 4 (providing all of the rights which Judge Tamm observed exist under Samoan law and additionally prohibiting capital punishment), _reprinted in_ Willens & Siemer, _Constitution of the Northern Mariana Islands: Constitutional Principles and Innovation in a Pacific Setting_, 65 Georgetown L.J. 1373, 1465 (1977).[30] To paraphrase Judge Tamm's conclusion:

> [T]he Government has not proffered so much as _one_ significant distinction between... [the Anglo-American] system of criminal justice and... [the NMI's]... [T]he reason for this analytical void is that, essentially, the distinctions do not exist... What the Government has overlooked is the inherent beauty of our system - its ability to accommodate precisely the 'vastly different ethnic and cultural heritages' which the Government views as inimical to it.

520 F.2d at 1157-1158 (emphasis in original).

There is even less of a basis for meaningful distinction here than there was in _King_. Prior to _King_, jury trials had not been held in American Samoa. _See_ Note, _The Application of the American Constitution to American Samoa_, 9 J. Int'l L. & Econ. 325, 339-340 (1974). In contrast, as the _Okaruru_ majority judicially noticed, jury trials have been held in the NMI at least since 1974.[31] They were initially authorized by the Congress of Micronesia and the Mariana Islands District Legislature in 1966. 5 Trust Territory Code 227 (1966); Mariana Islands District Code 3.12.010, 3.12.020 (1966). The government cannot credibly argue that the people of the NMI are "unaccustomed to common law traditions"[32] or "trained to a complete judicial system which knows no juries."[33]

The full text of footnote fourteen demonstrates that the _Duncan_ court's intention was to reject statements in prior cases that the governing "fundamental right" test

is whether "a civilized system could be imagined that would not accord the particular protection." 391 U.S. at 149 n.14, 88 S.Ct. at 1447 n.14. The court emphasized that the relevant inquiry is whether a right is fundamental within the common law legal tradition. It employed the phrase "Anglo-American regime of ordered liberty" as a synonym for "the common law system that has been developing contemporaneously in England and in this country." Id.. As indicated above, the NMI embraces that system.[34]

### 3. Conclusion

Although Duncan did not expressly overrule Balzac, Dorr or Mankichi, it does not follow that the Insular Cases' jury trial doctrine survived. "Higher courts rarely enumerate all the precedents overturned when a new principle is announced." Kniffin, Overruling Supreme Court Precedents: Anticipatory Action By United States Courts of Appeals, 51 Fordham L.Rev. 53, 57 n.21 (1982)(collecting authorities). The precedential force of older authority may be as effectively dissipated by a later trend of decision as by a statement expressly overruling it. Sablan Construction Co. v. Trust Territory of the Pacific Islands, 526 F.Supp. 135, 142 (D.N.M.I.App.Div. 1981). Therefore, when subsequent Supreme Court decisions have eroded an older case without explicitly overruling it, a lower federal court must follow the Supreme Court's new lead to a conclusion inconsistent with the older case. Rowe v. Peyton, 383 F.2d 709, 714 (4th Cir. 1967)(en banc), aff'd 391 U.S. 54, 57-58, 88 S.Ct. 1549, 1551, 20 L.Ed.2d 426 (1968). Duncan was a major step in what Justice Harlan aptly described as a "constitutional revolution" in the construction of the Fourteenth Amendment's Due Process Clause. Baldwin, 399 U.S. at 130, 90 S.Ct. at 1922 (concurring in the result and dissenting in a companion case). In Montalvo v. Colon the court concluded, as we do, that because of the "great similarity in the

practical and theoretical application of the tests used as to both states and unincorporated territories... the notion of 'fundamental rights', which has undergone such a metamorphosis in the context of the interpretation of the Fourteenth Amendment, must be deemed to have had a similar expansion as to... unincorporated territories]." 377 F.Supp at 1341.[35] By deciding that the right to jury trial is a fundamental due process right, _Duncan_ erased the constitutional foundation of the _Insular Cases_' jury trial doctrine. That doctrine is no longer good law.

B. Covenant § 501 and 5 Trust Territory Code § 501(1)

The question which we now address is whether the fundamental due process right to jury trial guaranteed by the Sixth and Fourteenth Amendments applies to criminal prosecutions under NMI law notwithstanding Covenant § 501(a) and 5 Trust Territory Code § 501(1). We hold that it does. Under the Constitution's Supremacy Clause (Article VI, Clause 2), § 501(a) is invalid. Section 501(b) falls because it purports to authorize Congress to approve § 501(a)'s jury trial language. Pursuant to Covenant § 505[36], 5 Trust Territory Code § 501(1) also is void because it is inconsistent with constitutional due process guarantees.

///
///

575

1. Judicial Review of the
 Covenant's Constitutionality

The <u>Okaruru</u> dicta suggested that Covenant § 105[37]
prevents the judiciary from invalidating Covenant provisions
which conflict with the Constitution. We emphatically
reject this interpretation. Section 105 is a restraint upon
<u>legislative</u> authority. Section 105 states that § 501 and
other fundamental Covenant provisions may be modified only
by the mutual consent of the governments of the United
States and the NMI. The purpose of § 105 is to protect the
NMI against unilateral congressional alteration of the NMI's
negotiated political status or the enactment of purely
"local" legislation which does not also apply to states.
See S.Rep. No. 433, <u>supra</u>, at 67; Senate General Legislation
Subcommittee Hearing, <u>supra</u>, at 135-141 (contemporaneous
memorandum of Covenant negotiating history submitted by
United States officials in response to a request by Senator
Hart); Marianas Political Status Commission, <u>Section By</u>
<u>Section Analysis of the Covenant to Establish a Commonwealth</u>
<u>of the Northern Mariana·Islands</u> 7, 15-19 (1975), <u>reprinted</u>
<u>in</u> Northern Mariana Islands: Hearing on S.J.Res. 107 Before
the United States Senate Committee on Interior and Insular
Affairs, 94th Cong. 1st Sess. 365, 371-377 (1975)(Senate
Interior and Insular Affairs Committee Hearing). Thus, § 105
expressly refers only to legislative modifications. The
enactment history reinforces the conclusion that § 105 is a

restraint upon legislative authority. See, e.g., S.Rep. No. 433, supra, at 67 (indicating that under § 105 "the United States agrees to limit the exercise of its legislative authority"). Moreover, Covenant § 903 states that cases or controversies arising under the Covenant are justiciable in federal court. This section manifests the awareness and the intent that the judiciary would ultimately resolve disputes concerning Covenant provisions and the rights which they define. Finally, Congress expressed uncertainty about § 501(a)'s constitutionality and the extent to which constitutional guarantees inherently apply in the NMI. See pp. 31-32, infra. Thus, Congress at least implicitly recognized that courts would have to resolve the lingering constitutional issues surrounding § 501(a). Cf. Flores de Otero, 426 U.S. at 590, 96 S.Ct. at 2275-2276 (stating a similar conclusion as to the determination of the applicability of the Constitution in the Commonwealth of Puerto Rico).

To the extent that the framers of § 105 actually intended to deny the judiciary the power to enforce the Constitution, § 105 is ineffectual. "It is emphatically the province and duty of the Judicial Department to say what the law is." United States v. Nixon, 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974); Marbury v. Madison, 5 U.S. (1 Cranch.) 137, 177, 2 L.Ed. 60, 73 (1803). This duty is a responsibility which the judiciary is not at

liberty to surrender or to waive. United States v. Dickson, 40 U.S. (15 Pet.) 141, 162, 10 L.Ed. 689, 697 (1841). As reflected by the fact that it was necessary to decide the Insular Cases, the applicability of the Constitution is itself a question of constitutional law reserved ultimately for the judiciary. Tiede, 86 F.R.D. at 242.

2. The NMI's Status as An "Unincorporated Territory" For Purposes of Constitutional Analysis Under the Doctrine of Territorial Incorporation

The government urges us to fashion a "new analysis" to supplant the Insular Cases' doctrine of territorial incorporation. It specifically submits that the doctrine's distinction between incorporated territories and unincorporated territories has outlived conceptual usefulness in an era of trusteeship administration and an emerging negotiated commonwealth relationship between the United States and the NMI. We must decline this invitation.

Unlike the Insular Cases' jury trial doctrine, their analytical framework remains viable and binds this Court. To the extent that time has undermined that analytical framework, erosion has occurred in the direction of favoring broader applicability of the Constitution in United States-controlled areas regardless of their technical political status. See note 21, supra. Since life evidently remains

in the analytical model of incorporated and unincorporated territories, this Court must apply it. The government will have to obtain its new rule[38] by constitutional amendment[39] or from the Supreme Court.

The Insular Cases' analytical framework is not so unworkable as the government perceives it to be. As explained by counsel who argued DeLima, Downes and Mankichi, the doctrine of territorial incorporation is necessarily couched in vague and elastic terms.[40] The Supreme Court has accordingly defined the term "unincorporated territory" in flexible language which arguably encompasses any status relationship other than statehood or incorporated territorial status. See note 13, supra. Courts have found the term sufficiently expansive to include the Trust Territory, of which the NMI remains part. See Ralpho, 569 F.2d at 618 and n.65; Thompson v. Kleppe, 424 F.Supp, 1263, 1268-1269 (D.Haw. 1976)(implied).[41] Those courts correctly concluded that the fact the United States administers the Trust Territory as a trustee rather than as a sovereign is a distinction without constitutional significance. 569 F.2d at 619 and n.72; 424 F.Supp. at 1267.[42] The Supreme Court's pronouncements concerning the Commonwealth of Puerto Rico are also instructive. Although the court's decisions have been "neither unambiguous nor exactly uniform,"[43] they appear to apply the doctrine of territorial incorporation to Puerto Rico with the view that the island is an "unincorporated territory" for purposes of

constitutional analysis. See, e.g., Rodriguez v. Popular
Democratic Party, ___ U.S. ___, ___, 102 S.Ct. 2194, 2198-
2199, 72 L.Ed.2d 628 (1982); Torres, 442 U.S. at 468-471, 99
S.Ct. at 2428-2429.[44] These decisions stand against a
backdrop of precedent which recognizes theoretical differences
between a commonwealth[45] and a conventional "unincorporated
territory."[46]

The Covenant's legislative history predictably
reveals a free and interchangeable use of the "commonwealth"
and "territory" labels to describe the NMI. The Senate
Committee on Interior and Insular Affairs observed that the
word "commonwealth" is not a technical term of art.[47]
The Senate Committees on Foreign Relations and Armed Services
further indicated that the United States-NMI relationship
under the Covenant would be "territorial in nature" although
denominated as a commonwealth. S.Rep. No. 596, 94th Cong.
2d Sess. 2 (1976)(S.Rep. No. 596), reprinted in 1976 U.S.
Code Cong. & Ad. News 448, 449 (1976 USCAN). These state-
ments are consistent with views expressed by the executive
branch. See, e.g., Commonwealth of the Northern Mariana
Islands: Hearing on H.J.Res. 549 before the United States
Committee on Foreign Relations, 94th Cong. 1st Sess. 40, 43
(1975); Senate Interior and Insular Affairs Committee
Hearing, supra, at 226 (statements by the President's
Personal Representative for Micronesian Status Negotiations
describing the NMI commonwealth as an "unincorporated terri-

tory"); S.Rep.No. 596, supra, at 8, reprinted in 1976 USCAN at 455 (summarizing executive branch testimony which characterized the NMI commonwealth as an "unincorporated territory").

We agree with Judge Stern that the Constitution is "a living document" which accommodates political and social evolution, and which is "to be applied under changing circumstances, in changing conditions and even in different places." 86 F.R.D. at 244.[48] Neither the Constitution's language nor its logic requires courts to confine the meaning of the judicially-originated term "unincorporated territory" to the types of status relationships which existed at the turn of the century. Although the inchoate NMI commonwealth has not yet fully gained the political status of a United States territory,[49] it is "no more a foreign nation than is the Commonwealth of Puerto Rico." Smith v. Pangelinan, 651 F.2d. 1320, 1325 (9th Cir. 1981)(dictum).[50] This unique position does not foreclose the NMI's inclusion within the broad generic class of "unincorporated territories" for purposes of constitutional analysis. Although the technical distinctions between a commonwealth and a conventional territory may be crucial in statutory construction,[51] there is no difference between a commonwealth and a conventional territory in constitutional analysis at least with respect to the applicability of fundamental constitutional rights. See notes 44-45, supra, and Sea Land Services Inc. v. Municipality of San Juan, 505 F.Supp. 533, 541 n.27 (D.P.R. 1980)

(collecting cases). We accordingly hold that the Commonwealth of the Northern Mariana Islands is an "unincorporated territory" for purposes of determining the applicability of the due process right to jury trial guaranteed by the Sixth and Fourteenth Amendments.

3. The Fundamental Due Process Right to Jury Trial Guaranteed by the United States Constitution Overrides Contrary Provisions in Covenant § 501 and 5 Trust Territory Code § 501(1)

A law which impinges upon a fundamental right explicitly or implicitly secured by the United States Constitution is presumptively unconstitutional. Harris v. McRae, 448 U.S. 297, 312, 100 S.Ct. 2671, 2685, 65 L.Ed.2d 784, reh. denied 448 U.S. 917, 101 S.Ct. 39, 65 L.Ed.2d 1180 (1980). Although we endeavor to construe legislation so as to avoid its unconstitutionality, we cannot engage in saving construction if statutory meaning and intent are clear, as they are here. Washington State Dairy Products Commission v. United States, 685 F.2d 298, 301-302 (9th Cir. 1982). The government correctly maintains that the Covenant represents the United States' fulfillment of its fiduciary obligation under Trusteeship Agreement Article 6.1 to grant self-government or independence in accordance with the desires of the NMI's people. See, e.g., S.Rep.No. 433, supra, at 23. This historical fact neither overcomes the presumption above

nor elevates the Covenant's authority to a level exceeding or commensurate with the paramount authority of the United States Constitution.[52]

 It is beyond debate that treaties and laws enacted pursuant to them must comply with the Constitution. E.g., Reid, 354 U.S. at 16, 77 S.Ct. at 1230; Geofroy v. Riggs, 133 U.S. 258, 267, 10 S.Ct. 295, 297, 33 L.Ed. 642 (1898); In Re Aircrash in Bali Indonesia, 684 F.2d 1301, 1308-1309 (9th Cir. 1982). In federal cases which have squarely addressed the applicability of the Constitution in the Trust Territory, the courts have ruled that constitutional guarantees govern the United States' performance of its trust obligations. See Ralpho, 569 F.2d at 618-619; Kleppe, 424 F.Supp at 1268-1269.[53] This is consistent with the established doctrine that the United States government "is entirely a creature of the Constitution." Reid, 354 U.S. at 5-6, 77 S.Ct. at 1125; accord, Dorr, 195 U.S. at 140, 24 S.Ct. at 809. This principle applies to the fulfillment of Trusteeship Agreement obligations to the same extent that it restrains the United States' performance of other international agreements. As Reid stated, "[i]f our foreign commitments become such that the Government can no longer satisfactorily operate within the bounds laid down by the Constitution, that instrument can be amended by the process which it prescribes." 354 U.S. at 14, 77 S.Ct. at 1229.

Thus, the Constitution governed the actions of the executive branch officials who negotiated the Covenant. The Supreme Court recently reaffirmed that even in the most delicate fields of international relations executive authority "must be exercised in subordination to the applicable provisions of the Constitution." Dames & Moore v. Regan, 453 U.S. 654, 661, 101 S.Ct. 2972, 2978, 69 L.Ed.2d 918 (1981). Because of the Constitution's supremacy over all other laws, no Act of Congress may authorize a constitutional violation. U.S. v. Odreal, 565 F.2d 598, 601 (9th Cir. 1977), cert.denied 435 U.S. 952, 98 S.Ct. 1581, 55 L.Ed.2d 803 (1978). The constitutional source of congressional legislative power over the Trust Territory has been alternately identified as the Territorial Clause (Article IV, Section 3, Clause 2)[54] or the Necessary and Proper Clause (Article I, Section 8, Clause 18).[55] While congressional authority under both clauses is admittedly broad, constitutional guarantees limit the exercise of that authority. E.g., Hooven & Allison Co. v. Evatt, 324 U.S. 652, 674, 65 S.Ct. 870, 881, 89 L.Ed. 1252, reh.denied 325 U.S. 892, 65 S.Ct. 1198, 89 L.Ed. 2004 (1945)(Territorial Clause); Chadha v. I.N.S., 634 F.2d 408, 433 (9th Cir. 1980), cert.granted ___ U.S. ___, 102 S.Ct. 87, 70 L.Ed.2d 81 (1981) (Necessary and Proper Clause). When Congress applies to a territory a non-fundamental constitutional provision which otherwise would be inapplicable, courts give great weight to the legislative

determination that the provision may be practically and beneficially implemented. Torres v. Commonwealth of Puerto Rico, 442 U.S., 470, 99 S.Ct. 2425, 2429, 61 L.Ed.2d 1 (1979). Nevertheless, the judiciary rather than Congress has the final word as to what constitutes Fourteenth Amendment due process. State Board of Insurance v. Todd, 370 U.S. 451, 457, 82 S.Ct. 1380, 1384, 8 L.Ed.2d 620 (1962). The judiciary also has the responsibility to adjudicate claims that a coordinate branch has exceeded its constitutional power. Chadha, 634 F.2d at 419. Therefore, the judiciary may be required to interpret the Constitution in a manner at variance with the construction given the document by another branch. United States v. Nixon, 418 U.S. at 704, 94 S.Ct. at 3105. This appeal presents an instance in which the judiciary must do exactly that.

Section 501(a)'s language and legislative history leave no doubt that Congress intended to "exempt" the NMI from compliance with the Duncan-Baldwin jury trial right notwithstanding the applicability of the Fourteenth Amendment's Due Process Clause to the NMI government. See, e.g., S.Rep. No. 433, supra, at 74-76. Yet, there is evidence of congressional uncertainty about § 501(a)'s constitutionality. The Senate Committee on Interior and Insular Affairs admitted that "[t]he formulation of... [§501(a)] has been complicated by a certain ambivalence in the decisions of the Supreme Court which hold that the provisions of the Constitution protecting fundamental rights of citizens extended to the territories

of the United States by their own force, while other provisions apply to unincorporated territories, such as the Northern Mariana Islands, only if expressly extended to them." S.Rep. No. 433, supra, at 73. A four-member Senate study of Pacific island polities warned that the Covenant's specification that only certain constitutional provisions apply is "an arrangement the constitutionality of which may be questioned." 122 Cong.Rec. 5137 (1976). Senator Harry Byrd likewise voiced concern about the "constitutional questions surrounding the proposed Covenant." Id. at 1123 (1976). Although these comments are general statements about § 501(a) which do not specifically address the jury trial question, they reflect that Congress was unsure of its powers regarding the NMI and the extent to which the Constitution inherently applied there.

The government submits that a ruling against its position will "force" jury trials upon the people of the NMI. This perceived problem is apparent rather than real. A defendant may voluntarily, knowingly and intelligently relinquish constitutional rights. E.g., Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). The Johnson standard applies to jury trial waivers. See Schneckloth v. Bustamante, 412 U.S. 218, 237 and n.22, 93 S.Ct. 2041, 2053 and n.22, 36 L.Ed.2d 854 (1973); United States ex rel. Williams v. DeRobertis, 538 F.Supp. 899, 903-904 (N.D.Ill. 1982)(collecting cases).[56] Moreover, the government's assertion that the people of the NMI do not want jury

trials is amply discredited both by appellant's presence before this Court and by the legislative history of the NMI Constitution.[57] In any event, even if the popular consensus during the Covenant's negotiation and approval was that the constitutional right to jury trial should be denied, the right emerged unaffected:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts. One's right to life, liberty... and other fundamental rights may not be submitted to vote; they depend upon the outcome of no elections.

West Virginia State Board of Education v. Barnette, 319 U.S. 624, 638, 63 S.Ct. 1173,, 1185-1186, 87 L.Ed. 1628 (1943).

 The Sixth and Fourteenth Amendments undeniably force jury trials upon the government against its will. As Duncan and its progeny teach, that is precisely the constitutional design:

> The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. A right to jury trial is granted to criminal defendants in order to prevent oppression by the Government... Providing an accused with the right to be tried by a jury... [affords] an inestimable safeguard against the corrupt or overzealous prosecutor and against the corrupt, biased, or eccentric judge... [T]he jury trial provisions in the Federal

> and State Constitutions reflect
> a fundamental decision about the
> exercise of official power--a
> reluctance to entrust plenary
> powers over the life and liberty
> of the citizen to one judge or
> to a group of judges. Fear of
> unchecked power, so typical of
> our State and Federal Governments
> in other respects, found expres-
> sion in the criminal law in this
> insistence upon community parti-
> cipation in the determination of
> guilt or innocence.

Duncan, 391 U.S. at 155-156, 88 S.Ct. at 1451; accord,

Burch v. Louisiana, 441 U.S. 130, 135, 99 S.Ct. 1623, 1626,

60 L.Ed.2d 96 (1979). The right to jury trial is essentially

part of the guarantee of a fair trial,[58] a guarantee which

is "the most fundamental of all freedoms." Estes v. Texas,

381 U.S. 532, 540, 85 S.Ct. 1628, 1632, 14 L.Ed.2d 543

(1965). "Jurors bring to a case the community's values and

common sense; their 'very inexperience is an asset because

it secures a fresh perception of each trial, avoiding the

stereotypes said to infect the judicial eye.'" Parklane

Hosiery Co. v. Shore, 439 U.S. 322, 355, 99 S.Ct. 645, 664,

58 L.Ed.2d 552 (1979) (Rehnquist, J., dissenting), quoting

H. Kalven & H. Zeisel, The American Jury 8 (1966).

Under Trusteeship Agreement Article 6.1, the

United States' primary fiduciary obligation to the people of

the NMI is to ensure that they attain self-government or

independence. Therefore, we agree with the government that

ultimate sovereignty and the concomitant right of self-

determination inherently repose in the NMI's people. See,

e.g., <u>Porter v. United States</u>, 496 F.2d 583, 588 n.4 (Ct.
Cl. 1974), <u>cert.denied</u> 420 U.S. 1004, 95 S.Ct. 1446, 43
L.Ed.2d 761 (1975). We accordingly hesitate to disturb any
of the Covenant's carefully negotiated provisions. Never-
theless, one of our preeminent judicial responsibilities is
to safeguard the cherished due process guarantees embodied
in the Bill of Rights and the Fourteenth Amendment. The
enduring principle which sustains our constitutional system
that "[t]here cannot exist under the American flag any
governmental authority untrammeled by the requirements of
due process." <u>Calero-Toledo v. Pearson Yacht Leasing Co.</u>,
416 U.S. 663, 669 n.5, 94 S.Ct. 2080, 2084 n.5, 40 L.Ed.2d
452 (1974); <u>accord, Ralpho</u>, 569 F.2d at 618-619. When the
NMI exercises its right of self-determination by entering
more closely into the United States system, fundamental
constitutional rights impose boundaries within which the new
relationship must function. In the words of commentary,
"once a society, such as the Northern Marianas, <u>freely</u>
chooses to become a part of the United States... the appli-
cation of... [fundamental constitutional rights cannot] be
the subject of negotiation." Branch, <u>The Constitution
of the Northern Mariana Islands: Does A Different Cultural
Setting Justify A Different Constitutional Standard?</u>, 9
Denver J. Int'l L. Pol'y 35, 39 (1980)(emphasis in original).

///

///

589

■ For the reasons above, we hold that the Sixth and Fourteenth Amendment fundamental due process right to jury trial expounded in <u>Duncan v. Louisiana</u> and <u>Baldwin v. New York</u>[59] prevails to the extent that it conflicts with Covenant § 501 and 5 Trust Territory Code § 501(1). Since the Constitution guarantees appellant the right to a jury trial, neither the United States government nor the NMI government has the discretion to deny that right. See <u>Tiede</u>, 86 F.R.D. at 239 n.61. We reverse the judgment below and remand for a new trial.

_March 31, 1983_
Date

_ALFRED LAURETA_
ALFRED LAURETA
United States District Judge

_Earl B. Gilliam_
EARL GILLIAM
United States District Judge

_Alex Munson_
ALEX MUNSON
Designated Judge

■

[1] Appellant additionally contends that the Commonwealth Trial Court erroneously denied his motion to suppress marijuana discovered in an inspection of boxes in his possession. He argues that the inspection was an unreasonable search prohibited by the Fourth and Fourteenth Amendments to the United States Constitution. Appellee maintains that the inspection was a constitutionally permissible, warrantless agricultural quarantine search.

For two reasons we do not reach the search issue. First, we have the prudential responsibility to dispose of this appeal on as narrow and as few constitutional grounds as possible. See, e.g., Sweatt v. Painter, 339 U.S. 629, 631, 70 S.Ct. 848, 849, 94 L.Ed.1114, reh.denied 340 U.S. 846, 71 S.Ct. 113, 95 L.Ed. 620 (1950); Ashwander v. TVA, 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). Since our jury trial holding alone mandates reversal, it is unnecessary to address appellant's additional argument. Second, our avoidance of that argument is also due to the fact that the Commonwealth Trial Court did not have the benefit of the Ninth Circuit's recent decision in Barusch v. Calvo, 685 F.2d 1199 (9th Cir. 1982). We believe that the lower court should have the initial opportunity to apply Barusch. If the lower court finds no federal constitutional violation, it should determine whether the challenged search violated the independent search and seizure protections in Article I, section 3 of the Northern Mariana Islands Constitution. In making this determination the court may seek guidance in, but need not follow, interpretations of similar language by United States, State, Trust Territory or other courts. See generally Camacho v. Civil Service Commission, 666 F.2d 1257, 1262, 1264 (9th Cir. 1982); Lorno Lonno v. Trust Territory of the Pacific Islands, 1 FSM Interim 53, 69-71 and n.11 (Federated States of Micronesia Supreme Ct.Tr. Div. 1981); Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv.L.Rev. 489. (1977).

[2] Trusteeship Agreement 6.1 states that the United States shall:

> foster the development of such political institutions as are suited to the trust territory and shall promote the development of the inhabitants of the trust territory toward self-government or independence as may be appropriate to the particular circumstances of the trust territory and its peoples and the freely expressed wishes of

591

the peoples concerned; and to this end shall give to the inhabitants of the trust territory a progressively increasing share in the administrative services in the territory; shall develop their participation in government; and give due recognition to the customs of the inhabitants in providing a system of law for the territory; and shall take other appropriate measures toward these ends.

[3] See also Gale v. Andrus, 643 F.2d 826, 830 (D.C.Cir. 1980) ("the task of the United States under the Trusteeship Agreement at issue is primarily to nurture the Trust Territory toward self-government").

[4] In a case in which the Ninth Circuit recognized the Trusteeship Agreement's judicial enforceability, the district court concluded that the United States "exercises a maximum degree of control" through Interior Department secretarial orders and had not made "any significant delegation of authority to the citizens of the Trust Territory." People of Saipan v. United States Department of the Interior, 356 F.Supp. 645, 655 (D.Haw. 1973), aff'd as modified on other grounds 503 F.2d 90, 94-95, 98 n.10 (9th Cir. 1974), cert. denied 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761 (1975). See generally Olsen, Piercing Micronesia's Colonial Veil: Enewetak v. Laird and Saipan v. Department of the Interior, 15 Colum.J. of Transnat'l L. 473 (1976).

[5] Between September 1969 and April 1972 the NMI and other areas of the Trust Territory collectively negotiated with the United States through the Congress of Micronesia's Joint Committee on Future Status. The NMI entered separate status negotiations when the other areas decided to pursue the more autonomous relationship of "free association." See generally S.Rep.No. 596, 94th Cong. 2d Sess. 4-5 (1976), reprinted in 1976 U.S. Code Cong. & Ad. News 448, 452; S.Rep.No. 433, 94th Cong. 1st Sess. 42-54 (1975)(S.Rep.No. 433).

6 Act No. 2-1972, 3d Mariana Islands District Legislature, First Special Sess. (1972), reprinted in S.Rep.No. 433, supra note 5, at 182-184.

7 See generally S.Rep.No. 433, supra note 5, at 159-388 (summary of negotiation rounds); D. McHenry, Micronesia: Trust Betrayed 130-169 (1975); Leibowitz, The Marianas Covenant Negotiations, 4 Fordham Int'l L.J. 19 (1980).

8 See, e.g., Pangelinan v. Castro, 688 F.2d 610, 611 n.2 (9th Cir. 1982); S.Rep.No. 433, supra note 5, at 65; Report of the Joint Drafting Committee on the Negotiating History C-4, reprinted in id., at 406.

9 See generally, Branch, Constitution of the Northern Mariana Islands: Does A Different Cultural Setting Justify A Different Constitutional Standard?, 9 Denver J. Int'l L. Pol'y 35 (1980); Willens & Siemer, Constitution of the Northern Mariana Islands: Constitutional Principles and Innovation in a Pacific Setting, 65 Georgetown L.J. 1373 (1977).

10 Title 5 Trust Territory Code § 501(1) states in relevant section:

> Any person accused by information of committing a felony punishable by more than five years imprisonment or by more than two thousand dollars fine, or both, shall be entitled to a trial by a jury of six persons.

This unrepealed statute is part of NMI law pursuant to Covenant § 505. See note 36, infra.

11 Balzac v. Puerto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922); Ocampo v. United States, 234 U.S. 91, 34 S.Ct. 712, 58 L.Ed. 1231 (1914); Dowdell v. United States, 221 U.S. 325, 31 S.Ct. 590, 55 L.Ed. 753 (1911); Dorr v. United States, 195 U.S. 138, 24 S.Ct. 808, 49 L.Ed. 128 (1904); Hawaii v. Mankichi, 190 U.S. 197, 23 S.Ct. 787, 47 L.Ed. 106 (1903); Fourteen Diamond Rings v. United States,

183 U.S. 176, 22 S.Ct. 59 L.Ed. 138 (1901); Dooley v. United States, 183 U.S. 151, 22 S.Ct. 62, 46 L.Ed. 128 (1901); Huus v. N.Y. & P.R. Steamship Co., 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901); Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); Armstrong v. United States, 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); Dooley v. United States, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); DeLima v. Bidwell, 182 U.S. 1, 21 S.Ct. 743 45 L.Ed. 1041 (1901). See also Rassmusen v. United States, 197 U.S. 516, 25 S.Ct. 514, 45 L.Ed. 820 (1905) (recognizing the applicability of the Sixth Amendment jury trial right in the continental "incorporated" territory of Alaska).

12 "Incorporated territories" are territories deemed "in all respects a part of the United States" [Downes v. Bidwell, 182 U.S. at 311, 21 S.Ct. at 796 (White, Shiras and McKenna, J.J., concurring)] and "destined for statehood from the time of acquisition." Examining Board of Engineers, Architects and Surveyors v. Flores de Otero, 426 U.S. 572, 599 n.30, 96 S.Ct. 2264, 2280 n.30, 49 L.Ed.2d 65 (1976).

13 "Unincorporated territories" are territories which are not "an integral part of the United States" [Downes v. Bidwell, 182 U.S. at 312, 21 S.Ct. at 796 (White, Shiras and McKenna, J.J., concurring)], and which the United States acquires without the objective of annexing them into the Union as states. Flores de Otero, 426 U.S. at 599 n.30, 96 S.Ct. at 2280 n.30.

14 See generally Coudert, The Evolution of the Doctrine of Territorial Incorporation, 26 Colum.L.Rev. 823 (1926); Fuster, The Origins of the Doctrine of Territorial Incorpo- and Its Implications Regarding the Power of the Commonwealth of Puerto Rico to Regulate Interstate Commerce, 43 Rev.Jur. U.P.R. 259, 264-293 (1974).

15 195 U.S. at 144-145, 148, 24 S.Ct. at 811-812.

16 Okaruru v. Commonwealth of the Northern Mariana Islands, DCA No. 80-9002, majority opinion at 3 (D.N.M.I.App.Div. 1981).

[17] In Okaruru the Commonwealth Trial Court had convicted defendant-appellant by bench trial of illegal use of a firearm in violation of 63 Trust Territory Code 3581(2). The court sentenced him to four years' imprisonment. The maximum penalty for the offense was five years' imprisonment, a $5,000 fine or both. On appeal Okaruru argued that he had been denied a jury trial in violation of both 5 Trust Territory Code § 501(1) and the Sixth and Fourteenth Amendments. Section 501(1) requires that a jury trial be afforded if defendant faces a potential fine exceeding $2,000. See note 10, supra. Thus, defendant's statutory right to jury trial indisputably had been violated. On that ground, the Okaruru panel reversed and remanded for a new trial. If a case may be resolved on either statutory or constitutional grounds, a court should not pass on the constitutional question if the statutory issue is dispositive. E.g., Harris v. McRae, 448 U.S. 297, 306-307, 100 S.Ct. 2671, 2683, 65 L.Ed.2d 784, reh. denied 448 U.S. 917, 101 S.Ct. 39, 65 L.Ed.2d 1180 (1980); Hagans v. Lavine, 445 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974). Because the § 501(1) issue mandated reversal, it was unnecessary to discuss constitutional questions in Okaruru.

The author of this decision writes about Okaruru with particular familiarity because he also wrote the Okaruru concurrence. More careful analysis and examination have firmly convinced him that Okaruru's precipitate constitutional pronouncements were erroneous. Today's decision reflects our conviction that judicial integrity and the duty to safeguard constitutional rights are paramount and enduring values to which misconceived dicta must give way.

[18] Like previous Supreme Court decisions which recognized the incorporation of Bill of Rights guarantees by the Fourteenth Amendment's Due Process Clause, Duncan determined whether the right in question was a necessary procedure in a common law regime of "ordered liberty." 391 U.S. at 149 n.14, 88 S.Ct. at 1447, n.14. See generally Part III-A-2, infra. The Insular Cases' jury trial doctrine regarded the right to jury trial as "merely a method of procedure" which was not fundamental in the sense of being one of "those safeguards to life and liberty which are deemed essential to our government." Dorr, 195 U.S. at 144-145, 24 S.Ct. at 811. The government does not articulate nor do we perceive a tenable distinction between these inquiries. Even if there were a distinction, Duncan's holding that the right to jury trial is a fundamental due process right which "reflects a profound judgment about the way law should be enforced and

justice administered" also necessarily decides that the right is a safeguard of life and liberty which is essential to government. 391 U.S. at 155, 88 S.Ct. at 1451.

The government observes that Justice White's concurrence in Downes v. Bidwell referred to "inherent, although unexpressed, principles which are the basis of all free government." 182 U.S. at 291, 21 S.Ct. at 788. The government apparently reasons that this is a formulation of the term "fundamental rights" which is distinguishable from Duncan's and which Balzac implicitly adopted by characterizing Justice White's Downes' concurrence as the court's "settled law." 258 U.S. at 305, 42 S.Ct. at 346.

We disagree. Assuming arguendo that Balzac incorporated Justice White's concurrence verbatim, the statement quoted above did not represent Justice White's full exposition of the concept of fundamental rights. The statement merely acknowledged that certain fundamental rights exist even though there is no "direct command of the Constitution" in which the rights are "expressed in so many words." Id.. Justice White additionally recognized that the Constitution contains specific textual prohibitions in favor of life and liberty which are "an absolute denial of all authority under any circumstances or conditions." Id. at 294, 21 S.Ct. at 790. Balzac subsequently declared that due process is one of these express safeguards. 258 U.S. at 313, 42 S.Ct. at 348. Duncan established that the explicitly granted right to jury trial is one of the protections afforded by the due process guarantee. 391 U.S. at 149, 156, 88 S.Ct. at 1447, 1451. Thus, even under Justice White's formulation Duncan stands for the proposition that the right to jury trial is fundamental.

19 195 U.S. at 144, 24 S.Ct. at 811.

20 190 U.S. at 220, 23 S.Ct. at 792.

21
> Neither the cases nor their reasoning should be given any further expansion. The concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and

> if allowed to flourish would
> destroy the benefit of a written
> Constitution and undermine the
> basis of our government.

Reid v. Covert, 354 U.S. 1, 14, 77 S.Ct. 1222, 1229, 1
L.Ed.2d 1148 (1957)(plurality). Recent Supreme Court
decisions have reiterated this criticism. See Harris v.
Rosario, 446 U.S. 651, 653, 100 S.Ct. 1929, 1930-1931, 64
L.Ed.2d 587 (1980)(Marshall, J., dissenting); Torres v.
Commonwealth of Puerto Rico, 442 U.S. 465, 475-476, 99 S.Ct.
2425, 2432, 61 L.Ed.2d 1 (1979)(Brennan, Stewart, Marshall
and Blackmun, J.J., concurring in the judgment). In 1976 a
majority of the Supreme Court stated that the Reid rehearing
opinion cited above had overruled the view in the court's
initial Reid decision, for which "[t]he Insular Cases served
as precedent," that the Constitution applies with full force
only in states and in incorporated territories. Flores de
Otero, 426 U.S. at 600 n.31, 96 S.Ct. at 2280 n.31.

22 Willens & Seimer, supra note 9, at 1395 n.95.

23 Other courts also have held or concurred in dictum that
as a result of Duncan the Insular Cases' jury trial doctrine
is no longer good law. See Gautier v. Torres, 426 F.Supp.
1106, 1109-1110 and n.5 (D.P.R. 1977)(dictum), rev'd on
other grounds 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65
(1978); Torres v. Delgado, 391 F.Supp. 379, 381 (D.P.R.
1974), aff'd on other grounds 510 F.2d 1182, 1183 n. (1st
Cir. 1975); Montalvo v. Colon, 377 F.Supp. 1332, 1336-1341
(D.P.R. 1974) (per curiam)(three-judge court)(dictum).
But see Santana v. Callazo, 533 F.Supp. 966, 971 (D.P.R.
1982)(dictum misciting Montalvo v. Colon for the proposition
that Balzac remains valid).

24 The court distinguished Johnson v. Eisentrager, 339
U.S. 763, 70 S.Ct. 936, 94 L.Ed 1255 (1950), Homma v.
Patterson, 327 U.S. 759, 66 S.Ct. 515, 90 L.Ed. 992 (1946);
In re Yamashita, 327 U.S. 1, 66 S.Ct. 340, 90 L.Ed. 499
(1946); and Ex Parte Quirin, 317 U.S. 1, 63 S.Ct. 2, 87
L.Ed. 3 (1942). United States v. Tiede, 86 F.R.D. 227,
244-245 and nn.70, 75 (U.S.C. Berlin 1979). Johnson, Homma,
Yamashita and Quirin denied constitutional protection to
aliens who were enemy nationals, enemy belligerents or
prisoners of war. Here, as in Tiede, these wartime deci-
sions are inapposite.

597

[25] *Tiede* independently supported its jury trial holding on the ground that the equal treatment of United States citizens and aliens in the United States Court for Berlin was required by an international agreement concerning offenses committed aboard commercial aircraft. *See* 86 F.R.D. at 259-260. Because the trial below occurred in an NMI court, this case does not require us to decide whether a United States international agreement similarly provides an independent basis in local law prosecutions for requiring the availability of jury trials in federal court to NMI residents who are not United States citizens.

[26] The majority remanded to the district court for a "jurisdictional" ruling on whether the Secretary of the Interior had the duty to compel the government of American Samoa to provide jury trials in accordance with the Constitution. *King v. Morton*. 520 F.2d 1140, 1146 (D.C. Cir. 1975). This ruling necessarily would involve a threshold decision on the issue of whether the constitutional right applied in American Samoa. The majority cautioned that it was not reaching this issue. Nevertheless, the majority thought it proper to "add a few words to assist the District Court on remand." *Id.*. The majority's expressly advisory constitutional analysis followed. On remand the district court ruled that the constitutional jury trial right applies in American Samoa. *See* 452 F.Supp. 11 (D.D.C. 1977).

[27] 354 U.S. at 54, 77 S.Ct. at 1250.

[28] The *Reid* plurality stated that the *Insular Cases* "involved the power of Congress to provide rules and regulations to govern temporarily territories with wholly dissimilar traditions and institutions." *Id.* at 14, 77 S.Ct. at 1229 (emphasis added). The plurality admonished that neither the *Insular Cases*' reasoning nor the characterization of the right to jury trial as non-fundamental remained viable in the modern era. *See* note 21, *supra*, and accompanying text. The plurality neither retreated from the rule that fundamental rights apply of their own force nor endorsed Justice Harlan's view that the operation of those rights depends upon an initial determination of whether the rights are "impractical" or "anomalous" in local territorial circumstances.

[29] Under other definitions which Duncan recognized, a "fundamental right" is one which is "at the base of all our civil and political institutions", "basic in our system of jurisprudence", or "essential to a fair trial." 391 U.S. at 148-149, 88 S.Ct. at 1447.

[30] See generally Analysis of the Constitution of the Commonwealth of the Northern Mariana Islands 7-23 (1976) (explaining that the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution provide the basis for the Northern Mariana Islands Constitution's search and seizure protections and other criminal procedural safeguards). The Northern Mariana Islands Constitutional Convention formally adopted the Analysis cited above as an interpretive guide for determining the Convention's intent. Resolution No. 16, Constitutional Convention of the Northern Mariana Islands (December 6, 1976), reprinted in the Analysis at 1.

[31] "[W]e are not impressed with the government's argument and brief which asserts that jury trials are "impractical" in the Northern Mariana Islands... As a matter of judicial notice, we observe that numerous jury trials have been held in the Northern Mariana Islands since 1974 under the provisions of 5 T.T.C. 501." Okaruru, majority opinion at 8 n.3.

[32] Torres, 442 U.S. at 469, 99 S.Ct. at 2428.

[33] Balzac, 258 U.S. at 310, 42 S.Ct. at 347.

[34] See also 1 Trust Territory Code § 103 (adopting the American Law Institute's Restatements of the Law as Trust Territory common law). Pursuant to Covenant § 505, this unrepealed statute remains part of NMI law. See note 36, infra.

[35] It is unimportant that Duncan did not expressly carry its holding beyond the fifty states. As Chief Judge Browning recently explained:

A lower federal court cannot responsibly decline to follow a principle directly and explicitly stated by the Supreme Court as a ground of decision and subsequently applied by the Supreme Court as an integral part of a systematic development of constitutional doctrine (citations omitted).

The Supreme Court cannot limit its constitutional adjudication to the narrow facts before it in a particular case. In the decision of individual cases the Court must and regularly does establish guidelines to govern a variety of situations related to that presented in the immediate case. The system could not function if lower courts were free to disregard such guidelines in any case that did not precisely match the facts of the case in which the guidelines were announced.

United States v. Underwood, 693 F.2d 1306, 1317-1318 (9th Cir. 1982)(Browning, Chief Judge, dissenting).

36 Covenant § 505 states:

The laws of the Trust Territory of the Pacific Islands, of the Mariana Islands District and its local municipalities, and all other Executive and District orders of a local nature applicable to the Northern Mariana Islands on the effective date of this Section and not inconsistent with this Covenant or with those provisions of the Constitution, treaties of laws of the United States applicable to the Northern Mariana Islands will remain in force and effect until and unless altered by the Government of the Northern Mariana Islands (emphasis added).

37 Covenant § 105 states:

> The United States may enact legis-
> lation in accordance with its cons-
> titutional processes which will be
> applicable to the Northern Mariana
> Islands, but if such legislation
> cannot also be made applicable to
> the several States the Northern
> Mariana Islands must be specifically
> named therein for it to become
> effective in the Northern Mariana
> Islands. In order to respect the
> right of self-government guaranteed
> by this Covenant the United States
> agrees to limit the exercise of
> that authority so that the funda-
> mental provisions of this Covenant,
> namely Articles I, II, and III and
> Sections 501 and 805, may be modi-
> fied only with the consent of the
> Government of the United States
> and the Government of the Northern
> Mariana Islands.

38 A new analysis would not accomplish the purpose which
the government seemingly has in mind. The government's
apparent objective is to lessen "the need for restrictions
upon the authority of Congress by the federal constitution
in the Trust Territory." Appellee's Brief 29.

 The first sentence of § 501(a) cautions that certain of
the enumerated constitutional provisions apply in the NMI
of their own force. Because the right to jury trial is a
fundamental due process right, it is one of those provi-
sions. The availability of the right results from the auto-
matic operation of the Constitution rather than from congres-
sional action. The language in § 501(a) which purports to
apply the Sixth Amendment and the Fourteenth Amendment's
Due Process Clause merely declares rights which already
inherently exist. Cf. Rassmusen, 197 U.S. at 526, 25 S.Ct.
at 518 (making an identical statement with respect to
congressional legislation purporting to "apply" the Fifth,
Sixth and Seventh Amendments to incorporated territories).
A new analysis would not lessen the force of the due process
right to jury trial unless the new rule unexpectedly announced
that henceforth Congress was free entirely from fundamental
restraints in the Bill of Rights.

[39] See generally Troutman, Needed-A New Territorial Clause In The U.S. Constitution, Vol. 2, No. 1 Guam B.J. 5 (1982).

[40]
> The very vagueness of the doctrine was valuable in that while the doctrine admitted that the Constitution was everywhere applicable to the actions of Congress, it failed anywhere to specify what particular portions of the Constitution were applicable to the newly acquired possessions. The doctrine has been sufficiently elastic to permit.of a government which, while maintaining the essentials of modern civil liberty, has not attempted to impose upon the new peoples certain ancient Anglo-Saxon institutions for which their history had not adapted them.

Coudert, supra note 14, at 850.

[41] See also Sechelong v. Trust Territory of the Pacific Islands, 2 T.T.R. 526, 528-529 (H.C.Tr.Div. 1964)(citing Balzac and treating the Trust Territory as an unincorporated territory in ruling implicitly that the Seventh Amendment right to jury trial in civil cases does not apply of its own force in the Trust Territory). Compare Sonoda v. Trust Territory of the Pacific Islands, 7 T.T.R. 442, 444-445 (H.C.App.Div. 1976) (relying upon Sechelong in rejecting the availability of the Sixth Amendment right to jury trial in criminal cases).

[42] The Trust Territory fits within the basic Insular Cases description of an "unincorporated territory" in that it is neither an integral part of the United States nor destined for statehood. See note 13, supra. Like the territories discussed in the early Insular Cases, the Trust Territory came under United States control "in a condition of temporary pupilage or dependence." Dorr, 195 U.S. at 148, 24 S.Ct. at 812 (citation omitted). Moreover, the protection of fundamental constitutional guarantees is implicit in the United

States' legal obligation to treat the people of the Trust Territory "with no less consideration than it would govern any part of its sovereign territory," and to "encourage respect for human rights and fundamental freedoms." _See_ Ralpho v. Bell, 569 F.2d 607, 619 and n.72, 626, reh. denied 569 F.2d 636 (D.C.Cir. 1977). The fact that United States is internationally accountable for the performance of its Trusteeship Agreement obligations is irrelevant to the applicability of constitutional protections. _Id._ at 619. It is equally immaterial that neither the framers of the Constitution nor the courts which decided the Insular Cases had before them a non-sovereign United States trust relationship with a dependent territory. See note 48, _infra_, and accompanying text.

43 426 U.S. at 599, 96 S.Ct. at 2280.

44 See also Green, Termination of the U.S. Pacific Islands Trusteeship, 9 Tex. Int'l L.J. 175, 188-189 (1974) ("In constitutional theory, Puerto Rico remains generically an unincorporated territory despite its Commonwealth label"); Leibowitz, The Commonwealth of Puerto Rico: Trying To Gain Dignity and Maintain Culture, 11 Ga.J.Int'l & Comp.L. 211, 280 (1981)(concluding that the Supreme Court's dicta have "supported Commonwealth as a legally recognized status of potentially great importance, but its holdings have treated Commonwealth as no different from a territory").

45 The Supreme Court's Puerto Rico decisions indicate that a commonwealth, "like a State, is an autonomous political entity 'sovereign over matters not ruled by the Constitution'" Rodriguez v. Popular Democratic Party, U.S. , , 102 S.Ct. 2194, 2199, 72 L.Ed.2d 628 (1982)(citation omitted) (emphasis added). The underlying concept is that the commonwealth derives its authority directly from the governed pursuant to a local constitution, and enters political affiliation with the United States under a bilateral agreement which confers vested rights and therefore is not unilaterally revocable by Congress. See generally Cordova v. Simonpietri Ins. Agency Inc., 649 F.2d 36, 39-42 (1st Cir. 1981); Americana of Puerto Rico Inc. v. Kaplus, 368 F.2d 431, 433-435 (3d Cir. 1966), cert.denied 386 U.S. 943, 87 S.Ct. 977, 17 L.Ed.2d 874 (1967); Northern Mariana Islands: Hearing on H.J.Res. 549 before the Subcommittee on General Legislation of the United States Senate Committee on Armed Services, 94th Cong. 1st Sess. 137, 143-145 (1975) (executive

branch memorandum supplied in response to a congressional request); Green, supra note 44, at 187-189; Magruder, The Commonwealth Status of Puerto Rico, 15 U.Pitt. L.Rev. 1, 12-20 (1953); Note, A Macrostudy of Micronesia: The Ending of a Trusteeship, 1972 N.Y.L.F. 139, 186-195 (1972).

46 An unincorporated territory is either "organized" under unilaterally imposed congressional organic legislation or administered by the Interior Department pursuant to congressional delegation in the absence of organic legislation. See, e.g., Guam v. Olsen, 431 U.S. 195, 97 S.Ct. 1774, 52 L.Ed.2d 250 (1977)(Guam); United States v. Standard Oil Company of California, 404 U.S. 558, 662 and n.2, 92 S.Ct. 661, 662 and n.2, 30 L.Ed.2d 713, reh.denied 405 U.S. 969, 92 S.Ct. 1166, 31 L.Ed.2d 244 (1972); 48 U.S.C. § 166(c); Exec. Order No. 10264, 16 Fed.Reg. 6417 (American Samoa). In contrast to a commonwealth, an unincorporated territory apparently "has no inherent right to govern itself." Guam v. Okada, 694 F.2d 565, 568 (9th Cir. 1982)(dictum). But see Leibowitz, United States Federalism: The States and the Territories, 28 Am.U. L.Rev. 449, 478 n.172 (1979)(suggesting a theoretical model to support territorial governmental sovereignty under the Tenth Amendment).

47

The term "commonwealth" is not a word describing any single kind of political relationship or status. A number of the States of the Union, including Virginia, Massachusetts and Kentucky, have the official name of Commonwealth. The same title is or was held by political entities as dissimilar as England under the Cromwells, Australia, Puerto Rico, and the Philippines during the ten-year period preceding their independence. The choice of the term "commonwealth" for the Northern Mariana Islands therefore does not denote any specific status, in particular it does not connote identity with the title held by the Commonwealth of Puerto Rico. The commonwealth status of the Northern Mariana Islands was

> developed on the basis of their
> particular needs drawing on the
> experience of all other territories
> of the United States, especially
> those of Guam, with the advantages
> and disadvantages of which the
> people of the Northern Mariana
> Islands have first had acquaintance.

S.Rep.No. 433, supra note 5, at 65.

[48] See also United States Trust Co. of New York v. New Jersey, 431 U.S. 1, 15-16, 97 S.Ct. 1505, 1514, 52 L.Ed.2d 92 (1977)("The great clauses of the Constitution are to be considered in the light of our whole experience, and not merely as they would be interpreted by its Framers in the conditions and with the outlook of their time"); United States v. Classic, 313 U.S. 299, 316, 65 S.Ct. 1031, 1038, 85 L.Ed. 1368 (1941)("in determining whether a provision of the Constitution applies to new subject matter, it is of little significance that it is one with which the framers were not familiar"); Home Building & Loan Association v. Blaisdell, 290 U.S. 398, 442-443, 54 S.Ct. 231, 242, 78 L.Ed. 413 (1934):

> It is no answer... to insist that
> what the provision of the Consti-
> tution meant to the vision of that
> day it must mean to the vision of
> our time. If by the statement
> that what the Constitution meant
> at the time of its adoption it means
> today, it is intended to say that
> the great clauses of the Constitu-
> tion must be confined to the inter-
> pretation which the framers, with
> the conditions and outlook of their
> time, would have placed upon them,
> the statement carries its own refu-
> tation... [A] constitution... [is
> intended] to endure for ages to
> come, and, consequently, to be adapted
> to the various crises of human
> affairs... [T]he case before us must be
> considered in the light of our whole
> experience and not merely in that
> of what was said a hundred years ago.

49 _Barusch v. Calvo_, 685 F.2d at 1202.

50 _See also People of Saipan_, 356 F.Supp. at 655 ("The United States exercises a maximum degree of control which is inconsistent with the assertion that the Trust Territory is a foreign country"), _aff'd_ 502 F.2d at 94-95; Commonwealth of the Northern Mariana Islands: Hearing on H.J.Res. 549 Before the United States Senate Committee on Foreign Relations, 94th Cong. 1st Sess. 164 (1975)("The Marianas are not a foreign country")(executive branch comment responding to an assertion by Senator Hart that the Covenant is a binding treaty); _id._ at 65 (revised testimony by Deputy Secretary of State Ingersoll stating that "[t]he Marianas are not a foreign country").

51 _See, e.g._, _Calero-Toledo v. Pearson Yacht Leasing Co._, 416 U.S. 663, 670-676, 94 S.Ct. 2080, 2085-2088, 40 L.Ed.2d 452 (1974)(holding that Puerto Rico statutes are "state statutes" for purposes of 28 U.S.C. § 2281, notwithstanding a contrary pre-commonwealth Supreme Court decision); _Cordova & Simonpietri Ins. Agency_, 649 F.2d at 38-44 and n.34 (holding that because of Puerto Rico's transition to commonwealth status it no longer is a "territory" covered by 15 U.S.C. § 3, notwithstanding a contrary pre-commonwealth Supreme Court decision).

52 We specifically reject contrary interpretations in the legislative history which suggest that in cases of conflict "the Constitution... of the United States will not override the Covenant," Marianas Political Status Commission, _Section By Section Analysis of the Covenant to Establish a Commonwealth of the Northern Mariana Islands_ 10 (1975), _reprinted in_ Northern Mariana Islands: Hearing on S.J.Res. 107 Before the United States Senate Committee on Interior and Insular Affairs, 94th Cong. 1st. Sess. 368 (1975):

53 _See also Castro v. United States_, 500 F.2d 436, 437, 448 (Ct.Cl. 1974); _Porter v. United States_, 496 F.2d 583, 591 (Ct.Cl. 1974), _cert.denied_ 420 U.S. 1004, 95 S.Ct. 1446, 43 L.Ed.2d 761 (1975); _Camacho v. United States_, 494 F.2d 1363, 1368-1369 (Ct.Cl. 1974); _Fleming v. United States_, 352

F.2d 533, 534 (Ct.Cl. 1965)(applying or assuming the applicability of the Fifth Amendment's Just Compensation Clause). But see Pauling v. McElroy, 164 F.Supp. 390, 393 (D.D.C. 1958), aff'd 278 F.2d 252, 254 n.3 (D.C.Cir. 1960) cert. denied 364 U.S. 835, 81 S.Ct. 61, 5 L.Ed.2d 60 (1960)(indicating that the Constitution does not protect Micronesian "non-resident aliens"). The District of Columbia Circuit subsequently narrowed Pauling by indicating that the decision stands for the proposition that non-resident aliens lack standing to challenge nuclear testing if they fail to allege a specific threatened injury. Constructores Civiles de Centroamerica S.A. v. Hannah, 459 F.2d 1183, 1190 n.13 (D.C. Cir. 1972). Ralpho v. Bell's recognition of the applicability of the Constitution in the Trust Territory further eroded Pauling's precedential force. Moreover, Pauling's sweeping statement relied upon Johnson v. Eisentrager, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950). Johnson's holding extended only to alien enemies of the United States. Id. at 785, 70 S.Ct. at 947; see note 24, supra, and accompanying text. This holding had no application to the friendly aliens in Pauling or to appellant here. See also In Re Aircrash in Bali Indonesia, 684 F.2d 1301; 1308 n.6 (9th Cir. 1982)(indicating the limited precedential reach of Johnson and Pauling).

54 See Ralpho, 569 F.2d at 618. Congressional power under the Territorial Clause extends to territory over which the United States lacks de jure sovereignty. See Vermilya-Brown Co. v. Connell, 335 U.S. 377, 381, 69 S.Ct. 140, 142-143, 93 L.Ed. 76 (1948), reh.denied 336 U.S. 928, 69 S.Ct. 652, 93 L.Ed. 1089 (1949).

55 See Note, Executive Authority Concerning The Future Political Status of the Trust Territory of the Pacific Islands, 66 Mich.L.Rev. 1277, 1281 n.6 (1968).

56 Under Federal Rule of Criminal Procedure 23(a), a federal criminal defendant cannot waive jury trial without the consent of the court and the government. This is a federal procedural rule which does not apply in state court unless state law so provides. See Singer v. United States, 380 U.S. 24, 32 n.6, 36-37, 85 S.Ct. 783, 788 n.6, 791, 13 L.Ed.2d 630 (1965)(comparing state constitutional and legislative provisions). Neither NMI legislation, judicial construction of the NMI Constitution, the Commonwealth Trial Court Rules of Criminal Procedure nor applicable sections of

the Trust Territory Code supply a counterpart to Rule 23(a).
Although 5 Trust Territory Code § 501(1) contains language
adopting the federal rules for use in jury trials, that
language was superceded by the promulgation of the
Commonwealth Trial Court Rules of Criminal Procedure.

57

> The Committee does not want to
> guarantee the right to trial by
> jury in all cases in the Northern
> Mariana Islands because of the
> expenses associated with juries,
> the difficulty of finding jurors
> unacquainted with the facts of
> a case, and the fear that the
> small closely-knit population in
> the Northern Mariana Islands might
> lead to acquittals of guilty persons
> in criminal cases. <u>Nonetheless, the
> Committee believes that in some cases,
> especially in those where defendants
> face serious criminal charges and
> long terms of imprisonment, the right
> to jury trial should be guaranteed</u>
> (emphasis added).

Report No. 4 of the Committee on Personal Rights and Natural
Resources (Oct. 29, 1976), <u>reprinted</u> <u>in</u> Vol. II, Journal of
the Northern Mariana Islands Constitutional Convention 506
(1976). The Covenant's legislative history does not contain
an extensive explanation of the reasons for § 501(a)'s jury
trial language. United States officials indicated to
Congress that the Covenant's negotiators chose the language
in recognition of the NMI's small population as well as to
facilitate the integration of the judicial systems of the
NMI and Guam in the event that the two jurisdictions desire
political union in the future. See Northern Mariana Islands:
Hearing on H.J.Res. 549 Before the Subcommittee on General
Legislation of the United States Senate Committee on Armed
Services, 94th Cong. 1st Sess. 134 (1975)(joint written
response by executive branch officials to a request by
Senator Hart for official legal opinions on the denial of
the right to jury trial in NMI courts).

58

See 391 U.S. at 149, 88 S.Ct. at 1447.

[59] The Ninth Circuit has emphasized that _Duncan_ and _Baldwin_ do not give "talismanic significance" to the "bright line" of six months' potential imprisonment in determining whether an offense is a serious one for which the Constitution guarantees the right to jury trial. Although the maximum penalty reflects the public's measure of the gravity of the offense, to gauge the seriousness of an offense courts must consider "the authorized penalty _and_... the 'relevant rules and practices followed by the federal and state regimes'". _United States v. Craner_, 652 F.2d 23, 24-25 (9th Cir. 1981)(citations omitted)(emphasis in original).